# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re ) | |
| ) | Chapter 11 |
| VIDEOMINING CORPORATION, ) | |
| ) | Bankruptcy Case No. 20-20425 GLT |
| Debtor ) | |
| _____ ) | |
| VIDEOMINING CORPORATION, ) | Document No. _____ |
| ) | Related to Document No. 13, 18 |
| Movant, ) | |
| ) | Hearing date and time: |
| v. ) | February 10, 2020 at 1:30 p.m. |
| ) | |
| ENTERPRISE BANK, WHITE OAK ) | Responses due: |
| BUSINESS CAPITAL, INC., ON DECK ) | February 10, 2020 at Noon |
| CAPITAL, ITRIA VENTURES, LLC, ) | |
| BROADWAY ADVANCE FUNDING, ) | |
| GREEN NOTE CAPITAL PARTNERS, ) | |
| INC., ) | |
| Respondents. ) | |
| ) | |

## OBJECTION OF WHITE OAK BUSINESS CAPITAL, INC. TO EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL

**AND NOW,** comes White Oak Business Capital, Inc. (formerly known as Federal National Payables, Inc., and formerly doing business as Federal National Commercial Credit) ("White Oak"), by and through its undersigned counsel and files the within *Objection Of White Oak Business Capital, Inc. To Emergency Motion for Interim and Final Orders Authorizing the Debtor to Use Cash Collateral* ("Objection") and in support thereof submits the following:

1.  VideoMining Corporation ("Debtor") filed its voluntary Chapter 11 Petition on February 4, 2020 ("Petition Date"). The Debtor is continuing to operate its business and manage its affairs as a Debtor-in-Possession.

2.      On February 5, 2020, the Debtor filed an *Emergency Motion for Interim and Final Orders Authorizing The Debtor to Use Cash Collateral*, listed as Document No. 13 on the Court's docket ("Cash Collateral Motion").

3.      White Oak objects to the proposed use of its cash collateral for the reasons set forth below.

## BACKGROUND

4.      Prior to the Petition Date, the Debtor and White Oak were parties to certain financing arrangements, more particularly described as follows:  White Oak, the Debtor, Rajeev Sharma and Vishnu Sharma (each a **"Guarantor"** and collectively the **"Guarantors"**) have entered into financing arrangements pursuant to which White Oak has purchased Accounts of the Debtor and/or made loans and other financial accommodations to the Debtor as set forth in (i) the Second Amended and Restated Loan and Security Agreement entered into as of April 17, 2018, White Oak and the Debtor (as the same now exists and may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced, the **"White Oak Loan Agreement"**), (ii) the Forbearance Agreement dated August 7, 2018 (as the same now exists and may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced, the **"White Oak Forbearance Agreement"**), (iii) those certain letters dated May 7, 2019 and May 23, 2019 White Oak sent to the Debtor and the Guarantors accelerating the Debtor's obligations to White Oak and demanding immediate payment of the Obligations (the **"Demand Letters"**), that certain letter dated May 23, 2019 detailing the discussions White Oak had their offices on May 20, 2019 (the **"May 20th Letter"**) and advising the Debtor of the Current Defaults, that certain letter dated June 27, 2019 detailing the terms and conditions of the Overadvance that was made to the Debtor on June 27, 2019 (the **"Overadvance Letter"**), that

certain letter dated July 8, 2019 advising the Debtor of the Overadvance Payment Default (the **"Overadvance Payment Default Letter"**), that certain letter dated July 29, 2019 (the **"Second Overadvance Letter"**), that certain letter dated August 12, 2019 (the **"Third Overadvance Letter"**), that certain letter dated August 27, 2019 (the **"August 27th Overadvance Payment Default Letter"**), that certain letter dated September 27, 2019 (the **"Fourth Overadvance Letter"**) and the certain letter dated of January 8, 2020 (the **"Fifth Overadvance Letter"**), and together with the May 20th Letter, the Overadvance Letter, the Overadvance Payment Default Letter, the Second Overadvance Letter, the Third Overadvance Letter, the August 27th Overadvance Payment Default Letter and the Fourth Overadvance Letter, being collectively referred to herein as (the **"White Oak Letters"**) and (iv) all other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith or related thereto, including, without limitation, all guaranties and security agreements made by Guarantors (all of the foregoing, together with the Loan Agreement, the White Oak Forbearance Agreement and the White Oak Letters, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, being collectively referred to herein as the **"White Oak Loan Documents"**).

5.      White Oak, together with the Debtor, Guarantors and Enterprise Bank entered into a Tri-Party Forbearance Agreement as of January 8, 2020 (the "**Original Tri-Party Forbearance Agreement**") as amended by that certain First Amendment to Tri-Party Forbearance Agreement dated as of January 30, 2020 (the "**First Amendment**" and together with the Original Tri-Party Forbearance Agreement, collectively referred to herein as the **"Tri-Party Forbearance Agreement"**) and on January 8, 2020 the Debtor, Guarantors and White Oak entered into a Fifth Overadvance Letter pursuant to which White Oak made an overadvance to the Debtor in an

amount equal to One Hundred Forty-Five Thousand Dollars ($145,000) to fund the payment of certain liabilities (the "**Fifth Overadvance**"). Copies of the Original Tri-Party Forbearance Agreement, the First Amendment and the Amended Budget for the period Jan-April 2020, and the Fifth Overadvance Letter are attached hereto, made a part hereof, and marked as Exhibits A-C respectively.

6. As of the Petition Date, the total amount due and owing by the Debtor to White Oak is approximately $1,409,918 including all accrued and unpaid fees and costs, including, without limitation, legal fees and costs.

7. Pursuant to the White Oak Loan Documents and as acknowledged by the Debtor, White Oak has a first lien security interest in the Debtor's accounts receivable and the proceeds thereof and a second lien security interest in all of the Debtor's other assets.

8. As evident by the multiple credit accommodations made by White Oak prior to the Petition Date (including as recently as January 30, 2020), much time and money has been expended to "work with" the Debtor to allow it to effectuate a sale of its assets in order to satisfy its obligations to its creditors, including White Oak.

9. Throughout this period, the Debtor has failed to perform as set forth in the various budgets it has submitted. And, the Debtor has failed to consummate a sale of its assets.

10. Some of the defaults committed by the Debtor include, without limitation, failure to remit funds as required under the White Oak Loan Documents, diversion by the Debtor, its officers and consultants of funds the Debtor's account debtors were to send to White Oak that were re-directed to the Debtor, submission of invoices that were fraudulent and other invoices the Debtor knew did not meet the requirements of Eligible Accounts (as defined in the White Oak Loan Documents), but they were submitted with false information, sending emails purporting to

confirm accounts receivable which the third party account debtors denied sending, and the failure to make payments on a timely basis, including, without limitation, the Second Overadvance Payment Default, as such term is defined in the White Oak Loan Documents.

11. A Termination Event occurred under the terms of the Original Tri-Party Forbearance Agreement when the Debtor failed to comply with the terms thereof, specifically, the Debtor failed to comply with the first bi-weekly test of the actual vs. budget by having $0 of sales against a budget of $125,000. This is significant since without the sales, the Debtor would have no cash flow in the future weeks when it was anticipated being received and would not be able to fund the Debtor's expenses. Without this cash flow, the Debtor's budget was worthless after only 2 weeks of providing it to White Oak and Enterprise Bank and in the Tri-Party Forbearance Agreement the Debtor and the Guarantors made the following representation to White Oak and Enterprise Bank:

> "As a material inducement to the Secured Creditors to enter into this Tri-Party Forbearance Agreement the Company and the Guarantors represent to the Secured Creditors (i) they have used their best efforts to prepare the Budget and the information contained therein is true and accurate to the best of their knowledge and (ii) other than the advance made by White Oak to the Company pursuant to the Fifth Overadvance Letter, the Company will be able to pay its expenses from its own cash flow and will not require any additional borrowings from the Secured Creditors."

12. For services rendered by the Debtor, the Hershey Company ("**Hershey**") owed the Debtor the approximate amount of $171,000 (the "**Hershey Receivable**"). Green Note Capital Partners, Inc. ("**Green Note**"), an unsecured lender to the Debtor, had improperly put Hershey

on notice that it held a lien on the Hershey Receivable when it did not have a properly perfected security interest, causing Hershey to refuse to release payment of the Hershey Receivable without the written consent of Green Note. The Debtor had negotiated a settlement with Green Note for a full release for a payment of $25,000. White Oak's position was, and remains, that proceeds of its collateral should not be used by the Debtor to pay Green Note, an unsecured creditor. If the Debtor wanted to pay Green Note, it had to do so with subordinated or unsecured debt. The Debtor negotiated a subordinated loan from Murtaza Amil in the amount of $25,000 (the "**Murtaza Loan**"), the proceeds of which the Debtor would use to pay Green Note and thereby obtain payment to White Oak of the Hershey Receivable.

13. Despite the occurrence of the Termination Event and the Debtor's numerous failures to comply with the terms of the White Oak Loan Documents, White Oak indicated it would continue to "work with" the Debtor to assist it to obtain payment of the Hershey Receivable to allow it to operate and sell some or all of its patent portfolio as provided in the Tri-Party Forbearance Agreement so it could fully pay and satisfy White Oak.

14. The Debtor and its consultant negotiated the First Amendment with White Oak and Enterprise Bank and a Settlement Agreement and Release with Green Note and the terms of the Murtaza Loan. The arrangements were, the Debtor would use the proceeds of the Murtaza Loan to pay Green Note an agreed upon settlement amount of $25,000, upon which Green Note would withdraw its claim to the Hershey Receivable; Hershey would pay the Hershey Receivable to White Oak, who in accordance with the Tri-Party Forbearance Agreement, would hold such funds in a White Oak account; and upon requests by the Debtor, provided it was in compliance with the terms of the Tri-Party Forbearance Agreement, White Oak would release proceeds of its

collateral to the Debtor to be used for the payment of its operating expenses in accordance with the Amended Budget.

15. White Oak agreed to the terms of the First Amendment, only to find the Debtor had fraudulently induced White Oak to enter into the First Amendment and to release $64,250 of the proceeds of White Oak's collateral to the Debtor. The Debtor falsely represented it would use such proceeds to pay expenses in accordance with the Amended Budget. The Debtor failed to disclose to White Oak that on the same day as the execution of the First Amendment, the release by White Oak of the proceeds of its collateral and the the receipt of the Murtaza Loan, the Debtor had knowledge, but did not tell White Oak, and perhaps Enterprise Bank, that an additional notice had been sent to Hershey by another subordinated lender that it had a lien on the Hershey Receivable and it demanded payment of the Hershey Receivable. Therefore, based upon information and belief, Hershey notified the Debtor it would not pay the Hershey Receivable until it received a release from the second notice.  The Debtor knowing it did not have the funds to fully pay and satisfy the two subordinated lenders that had notified Hershey, it still sent White Oak a confirmation that the wire to fund the Murtaza Loan was sent so as to fraudulently induced White Oak to release the proceeds of its collateral that were used to pay the retainer for its bankruptcy counsel. The proceeds of the Murtaza Loan were not received until almost 2 hours after the wire for the retainer was sent by the Debtor.

16. Instead of assuring that White Oak got paid the Hershey Receivable, the Debtor knowingly and intentionally breached the Tri-Party Agreement, paid a retainer to counsel, and filed this case.

17. Immediately prior to the Petition Date, Enterprise Bank (the other party to the Tri-Party Agreement) refused White Oak's request to return to White Oak the portion of the $64,250

advance that the Debtor had not yet expended. In an email exchange on November 20, 2019 between White Oak's counsel and Joseph Fidler, General Counsel of Enterprise Bank, Mr. Fidler wrote in part:

> "Enterprise Bank will review the funds in the operating account and to the extent any funds held are derived from A/R, Enterprise Bank will pay those funds over to White Oak as directed."

Despite these assurances, Enterprise Bank failed to exercise control over those funds and pay the funds to White Oak. As a result, White Oak has advised Enterprise Bank that it is in breach of the Amended and Restated Intercreditor Agreement effective among Enterprise Bank, the Debtor and White Oak and demanded restitution of the funds released to the Debtor by Enterprise Bank.

## OBJECTION TO PROPOSED USE OF CASH COLLATERAL

18.     For the reasons set forth above, White Oak has no faith in the Debtor's ability to perform.

19.     The Debtor proposes to use White Oak's cash collateral in exchange for White Oak agreeing to accept 15% of the pre-Petition Date accounts collected and in reliance upon the Debtor's estimated value of its patents. This is not adequate protection of White Oak's interests as required by the Bankruptcy Code.

20.     Clearly, paying White Oak 15% of an account that it is entitled to collect in full does not equate to any actual adequate protection. The Debtor appears to intend to spend the account proceeds on operations – once expended the funds will be forever lost.

21.     The Debtor's reliance on the value of its patent holdings is also misplaced. There is no indication that an actual buyer would pay anywhere near $20,000,000 for the patents. In fact, the Debtor's most recent effort to sell the patents failed at an amount that was less than one-quarter of the Debtor's stated value for the Patents. The Debtor has failed twice in the past 6 months to sell the company as a whole and/or the patents.

22. It is not at all clear that there is an equity cushion in the patent assets, so the patents do not provide adequate protection to White Oak. If the Debtor is so certain of the value of the patents, it should be able to obtain DIP financing by granting a junior lien on the patents. The Debtor has not provided a clear picture of the liens upon the patents, so as to determine what, if any, value is available on a subordinated basis. The only way to provide White Oak with adequate protection is to provide it with a super-priority lien on all assets of the Debtor, including, without limitation, the patents.

23. Even if the Debtor were to offer White Oak replacement liens on post-petition accounts, White Oak has no confidence that its collateral will be fully replaced by the Debtor's post-petition activities. As noted previously, the Debtor has no current history of performing under its budgets. The Debtor has failed to show any ability to abide by a budget and it has been woefully lacking in its ability to generate sales in accordance with its forecasts, therefore any promise of liens on post-petition accounts receivable cannot be relied upon.

24. With regards to the budget attached to the Debtor's motion and the use of cash collateral White Oak has a number of concerns and questions:

   a. If the Court does grant use of cash collateral to the Debtor, White Oak requests that it be on a short interim basis to see if the Debtor can perform for at least a period of no longer than 2 weeks. If that is the case, the use of cash collateral should be limited to only those expenses that are emergent, such as where the Debtor can provide the Court with proof of termination of services for non-payment in the next 2 weeks and payroll, which the Debtor pays only at the end of each month. All other collections of White Oak's collateral should be paid to White Oak.

   b. In the event there is a negative deviation from the Debtor's budget during the interim period, the Debtor's use of cash collateral should immediately cease without any further notice or order. The Debtor should be required to notify all parties-in-interest of such negative deviation and seek to obtain a hearing with the Court for the parties to be heard regarding whether the Debtor should be permitted to continue to use cash collateral.

    c. There is not sufficient information in the budget to determine if the Debtor is paying pre-petition or only post-petition expenses. The disbursements in weeks 1-3 appear to include prepetition expenses that they are paying post-petition. During the first 2 weeks, they have no payroll or benefit payments due, so there should be minimal expenses since post-petition expenses generally are not due that soon after a filing. The rent should not be due until March 1, 2020 and all pre-petition utilities and service providers' bills are subject to the automatic stay.

    d. The rent payments are being made to an insider, Rajeev Sharma, the owner and Chief Executive Officer of the Debtor, therefore, these payments should not be permitted until the secured creditors are paid in full. In addition, there are significant payroll payments to Mr. Sharma that should not be made at this time since he is a guarantor of the White Oak obligations, and payments to him should be withheld at a minimum until the final cash collateral order is entered.

    e. The Debtor has payments for its legal counsel, consultants and other professionals in the initial weeks of the budget should be eliminated since their employment is subject to the approval of the Court and then they have to make an application for the payment of such fees and obtain Court approval of same. Therefore, the Debtor should not have any legal fee or other consultant payments in the budget for some period of time, probably during the initial 13 weeks of the case and therefore, these expenses should be eliminated from the budget and eliminate the need for a DIP loan for some period of time. In summary, the budget is not showing the Debtor's actual cash needs are for the time period.

25. For these reasons, White Oak believes the Debtor's proposed DIP budget is not accurate, contains payments for amounts on an interim basis are not emergent payments, many inaccuracies as to amounts that are permitted to be paid under the Code, payments that will be due much later than when indicated in the budget and payments to an insider. Based upon these reasons, White Oak objects to any use of its cash collateral and any of its cash collateral not necessary for the Debtor's appropriate payments should be paid to White Oak.

26. White Oak objects to the request for the Debtor to use the cash collateral because the Debtor is simply seeking to use more of the proceeds of White Oak's collateral without providing any meaningful adequate protection. Additionally, the Debtor has not made any

proposal to reimburse or provide adequate protection for the $64,250 White Oak was fraudulently induced to make available to the Debtor immediately prior to the Petition.

WHEREFORE, for the reasons set forth above, White Oak respectfully requests that this Court enter an Order denying the Debtor's use of cash collateral and providing such other and further relief as the Court deems to be just and proper.

Dated: February 10, 2020

**STONECIPHER LAW FIRM**

*/s/ George T. Snyder*
George T. Snyder, Esq.
PA ID No. 53525
125 First Avenue
Pittsburgh, PA 15222
Ph. (412) 391-8510
gsnyder@stonecipherlaw.com

and

**MANDELBAUM SALSBURG, P.C.**

/s/ Jeffrey M. Rosenthal
Jeffrey M. Rosenthal, Esq.
NJ Atty. No. 4160933
3 Becker Farm Road
Roseland, NY  07068
JRosenthal@lawfirm.ms
(Pro Hac Vice Admission granted)

Counsel to White Oak Business Capital, Inc.