TRI-PARTY FORBEARANCE AGREEMENT

THIS TRI-PARTY FORBEARANCE AGREEMENT (this "**Tri-Party Forbearance Agreement**"), dated as of January 8, 2020, is entered into by and among **VIDEOMINING CORPORATION,** a corporation organized under the laws of the State of Delaware, having its principal offices at 403 South Allen Street, Suite 101, State College, Pennsylvania 16801 ("**Company**"), **Enterprise Bank**, a bank formed under the laws of the Commonwealth of Pennsylvania, having its principal offices at 4091 Mount Royal Boulevard, Allison Park, PA 15101 (the "**Bank**") and **WHITE OAK BUSINESS CAPITAL, INC.** (formerly known as Federal National Payables, Inc., and formerly doing business as Federal National Commercial Credit) ("**White Oak**" and collectively and individually with the Bank referred to herein as the "**Secured Creditors**").

W I T N E S S E T H:

WHEREAS, White Oak, the Company, Rajeev Sharma and Vishnu Sharma (each a "**Guarantor**" and collectively the "**Guarantors**") have entered into financing arrangements pursuant to which White Oak has purchased Accounts of the Company and/or made and may hereafter make loans and other financial accommodations to the Company as set forth in (i) the Second Amended and Restated Loan and Security Agreement entered into as of April 1, 2018, White Oak and the Company (as the same now exists and may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced, the "**White Oak Loan Agreement**"), (ii) the Forbearance Agreement dated August 1, 2018 (as the same now exists and may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced, the "**White Oak Forbearance Agreement**"), (iii) those certain letters dated May 7, 2019 and May 23, 2019 White Oak sent to the Company and the Guarantors accelerating the Company's obligations to White Oak and demanding immediate payment of the Obligations (the "**Demand Letters**"), that certain letter dated May 23, 2019 detailing the discussions White Oak had their offices on May 20, 2019 (the "**May 20th Letter**") and advising the Company of the Current Defaults, that certain letter dated June 27, 2019 detailing the terms and conditions of the Overadvance that was made to the Company on June 27, 2019 (the "**Overadvance Letter**"), that certain letter dated July 8, 2019 advising the Company of the Overadvance Payment Default (the "**Overadvance Payment Default Letter**"), that certain letter dated July 29, 2019 (the "**Second Overadvance Letter**"), that certain letter dated August 12, 2019 (the "**Third Overadvance Letter**"), that certain letter dated August 27, 2019 (the "**August 27th Overadvance Payment Default Letter**"), that certain letter dated September 26, 2019 (the "**Fourth Overadvance Letter**") and the certain letter dated of even date herewith (the "**Fifth Overadvance Letter**", and together with the May 20th Letter, the Overadvance Letter, the Overadvance Payment Default Letter, the Second Overadvance Letter, the Third Overadvance Letter, the August 27th Overadvance Payment Default Letter and the Fourth Overadvance Letter, being collectively referred to herein as the "**White Oak Letters**") and (iii) all other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith or related thereto, including, without limitation, all guaranties and security agreements made by Guarantors (all of the foregoing, together with the Loan Agreement, the White Oak Forbearance Agreement and the White Oak Letters, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, being collectively referred to herein as the "**White Oak Loan Documents**");

Exhibit A

WHEREAS, the Bank, the Company and the Guarantors have entered into financing arrangements pursuant to which the Bank has made loans and other financial accommodations to the Company as set forth in as set forth in that certain Business Loan Agreement, dated January 12, 2017, executed and delivered by Company in favor of Bank in the original principal amount of $800,000.00 ("Bank Loan Agreement"), and evidenced by the terms of that U.S. Small Business Administration Note, dated January 12, 2017 executed and delivered by Company in favor of Enterprise Bank in the original principal amount of $800,000.00 ("Bank Note") together with all other loan documents and agreements executed in connection therewith (as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, being collectively referred to herein as the "**Bank Loan Agreement**" and together with the White Oak Loan Agreement referred to herein, collectively and individually, as the "**Secured Creditors Loan Agreements**") and together with all other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith or related thereto, including, without limitation, all guaranties and security agreements made by Guarantors (all of the foregoing, together with the Bank Loan Agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, being collectively referred to herein as the "**Bank Loan Documents**", and together with the White Oak Loan Documents referred to herein as the "**Secured Creditors Loan Documents**")

WHEREAS, certain White Oak Specified Defaults (as defined below) have occurred and the Company was notified of same in White Oak Letters, and such Specified Defaults are continuing under the White Oak Loan Documents; and

WHEREAS, certain Bank Specified Defaults (as defined below) have occurred and the Company was notified of same on November 6, 2019 pursuant to that certain Notice of Default and Acceleration **("Bank Notice of Default')**, and such Bank Specified Defaults are continuing under the Bank Loan Documents; and

WHEREAS, the Company and Guarantors have requested that the Secured Creditors forbear from exercising their respective rights and remedies under the Secured Creditors Loan Documents due to the occurrence of the White Oak Specified Defaults [and the Bank Specified Defaults] and make certain other amendments to the Secured Creditors Loan Documents.

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree, covenant and warrant as follows:

SECTION 1. DEFINITIONS.

    1.1 Existing Definitions. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Secured Creditors Loan Documents.

    1.2 Additional Definitions. As used herein, the following terms shall have the respective meanings given to them below and the Secured Creditors Loan Documents shall be deemed and are hereby amended to include, in addition to and not in limitation of all other definitions, each of the following definitions:

2

(a) "**Bank Specified Defaults**" shall mean, collectively, the Company's failure to make payments when due in accordance with the terms and conditions of the Bank Note.

(b) "**Budget**" shall mean the initial budget of the Company annexed to this Tri-Party Forbearance Agreement as <u>Exhibit A</u> hereto, together with any subsequent or amended budget(s) thereto delivered to the Secured Creditors, and acceptable to the Secured Creditors, in accordance with the terms and conditions of this Tri-Party Forbearance Agreement.

(c) "**Collateral**" means all of the assets of the Company that are defined as "Collateral" in the Secured Creditors Loan Documents.

(d) "**Forbearance Effective Date**" means the date on which this Tri-Party Forbearance Agreement is executed and all of the documents listed in Section 8 hereof have been received by the Secured Creditors or receipt thereof has been waived or the time of delivery extended by the Secured Creditors.

(e) "**Fully Vested**" means [to be defined by the Bank].

(f) "**Specified Defaults**" means collectively, the Bank Specified Defaults and the White Oak Specified Defaults.

(g) "**Tri-Party Forbearance Period**" means the period from the Tri-Party Forbearance Effective Date to the Tri-Party Forbearance Termination Date.

(h) "**Tri-Party Forbearance Termination Date**" shall mean the earlier to occur of (i) April 30, 2020 or (ii) the date on which any Tri-Party Forbearance Termination Event occurs.

(i) "**Tri-Party Forbearance Termination Event**" is defined in Section 6 of this Tri-Party Forbearance Agreement.

(j) "**White Oak Accounts Amount**" means on any given date the amount of Company's Accounts.

(k) "**White Oak Accounts Initial Amount**" means Seven Hundred Six Thousand Four Hundred Eighty-Five Dollars ($706,485.00), which is the amount of White Oak Accounts Amount as of the Forbearance Effective Date.

(l) "**White Oak Specified Defaults**" shall mean, collectively, the Events of Default described in the White Oak Letters.

1.3 <u>References to Loan Documents</u>. From and after the Tri-Party Forbearance Effective Date, all references herein and in the Secured Creditors Loan Agreements to "Loan Documents" shall be deemed to include, without limitation, a reference to this Tri-Party Forbearance Agreement.

SECTION 2.   ACKNOWLEDGMENTS.

2.1 <u>Acknowledgment of Obligations</u>.

(a) The Company and Guarantors hereby acknowledge, confirm and agree that (i) as of the close of business on January 6, 2020, the aggregate outstanding principal amount of the indebtedness owed to the Bank is $612,779.36, (ii) such amount, together with all interest accrued and accruing thereon, and all fees, costs, expenses including all reasonable and actually incurred attorney's fees and expense, and other charges now or hereafter payable by the Company to the Bank under the Bank Loan Documents, is unconditionally owing by the Company to the Bank without offset, defense or counterclaim of any kind, nature or description whatsoever and (iii) its obligation and liability for the payment and performance of the obligations pursuant to the Bank Loan Documents is unconditionally owing to the Bank without offset, defense or counterclaim of any kind, nature or description whatsoever. The amount set forth herein maybe subject to change to the receipt of amounts not yet applied or clerical errors.

(b) The Company and Guarantors hereby acknowledge, confirm and agree that (i) as of the close of business on January 6, 2020, the aggregate outstanding principal amount of the indebtedness owed to White Oak is $1,212,592.39, (ii) such amount, together with all interest accrued and accruing thereon at the default rate of 15% per annum, and all fees, costs, expenses including all reasonable and actually incurred attorney's fees and expense, and other charges now or hereafter payable by the Company to White Oak under the White Oak Loan Documents, is unconditionally owing by the Company to White Oak without offset, defense or counterclaim of any kind, nature or description whatsoever and (iii) its obligation and liability for the payment and performance of the Obligations pursuant to the White Oak Loan Documents is unconditionally owing to White Oak without offset, defense or counterclaim of any kind, nature or description whatsoever. The amount set forth herein may be subject to change to the receipt of amounts not yet applied or clerical errors.

2.2 _Acknowledgment of Security Interests_. The Company and Guarantors hereby acknowledge, confirm and agree that the Secured Creditors have and shall continue to have valid, enforceable and perfected liens upon and security interests in the Collateral and all other assets and properties of the Company upon or in which the Secured Creditors have been granted or hold a lien or security interest.

2.3 _Binding Effect of Documents_. The Company and Guarantors hereby acknowledge, confirm and agree that: (a) each of the Secured Creditors Loan Document to which the Company or Guarantors are a party, including, without limitation, any guaranties made by Guarantors, have been duly executed and delivered by the Company or Guarantors to each of the Secured Creditors and is in full force and effect as of the date hereof, (b) the agreements and obligations of the Company or Guarantors contained in the Secured Creditors Loan Documents, including, without limitation, any guaranties made by Guarantors, constitute the legal, valid and binding obligations of the Company or Guarantors, enforceable against the Company or Guarantors in accordance with the terms thereof, and the Company and Guarantors have no valid defense to the enforcement of such obligations, and (c) the Secured Creditors are and shall be entitled to the rights, remedies and benefits provided for in the Secured Creditors Loan Documents, including, without limitation, any guaranties made by Guarantors.

SECTION 3. _FORBEARANCE AS TO SPECIFIED DEFAULTS; LOAN PAYMENTS_.

4820-0476-1519, v. 7

3.1 <u>Acknowledgment of Specified Defaults</u>. The Company and Guarantors hereby acknowledge, confirm and agree that (a) each Specified Default has occurred and is continuing, (b) each Specified Default constitutes a Default under the Secured Creditors Loan Documents and (c) in the absence of this Tri-Party Forbearance Agreement, the occurrence of the Secured Creditors Specified Defaults entitles the Secured Creditors to exercise their rights and remedies under the Secured Creditors Loan Documents, applicable law and otherwise, including, without limitation, the right to declare all obligations to be immediately due and payable.

3.2 <u>Forbearance</u>.

(a) In reliance upon the representations, warranties and covenants of the Company and Guarantors contained in this Tri-Party Forbearance Agreement, and subject to the terms and conditions of this Tri-Party Forbearance Agreement, the Secured Creditors agree that, the Secured Creditors shall forbear from exercising their respective rights and remedies under the Secured Creditors Loan Documents or applicable law due to the occurrence of the Specified Defaults.

(b) Upon the expiration of the Forbearance Period, the agreement of the Secured Creditors to forbear with respect to the Specified Defaults shall automatically and without further action terminate and be of no force and effect, it being understood and agreed that the effect of such termination will be to permit the Secured Creditors to immediately exercise, without any further notice or forbearance of any kind, all of its rights and remedies under the Secured Creditors Loan Documents, applicable law or otherwise with respect to the Specified Defaults or any other Event of Default which shall exist or shall have occurred and be continuing at such time, including, without limitation, terminating the Secured Creditors Loan Agreements and declaring any or all obligations to be immediately due and payable.

(c) No termination of the Secured Creditors Loan Documents shall relieve or discharge any of the Company or the Guarantors of its/his/her duties, covenants and obligations under the Secured Creditors Loan Documents until all obligations have been indefeasibly paid and satisfied in full in immediately available funds on terms and conditions acceptable to the Secured Creditors. The Company and Guarantors hereby expressly waive any right to receive notification under Section 9-611 of the UCC or otherwise of any disposition of any Collateral by the Secured Creditors or their designees, and waive any rights under Sections 9-620(e) and 9-623 of the UCC.

3.3 <u>Collection of Proceeds of Accounts Receivable</u>. At all times after the Forbearance Effective Date, the Company shall direct all account debtors to make all payments directly to the Company's lockbox maintained by White Oak with Wells Fargo Bank, N.A. (the "**Lockbox**") and any payments received by the Company shall be immediately deposited in kind into the Lockbox. Without the prior written consent of the Secured Creditors, the Company will not have access to withdraw or transfer any funds in the Lockbox. White Oak will maintain such funds in a non-interest bearing account in the name of White Oak (the "**Proceeds Account**"). The Company agrees to discontinue use of and terminate all other depository accounts with the Bank and any other financial institutions, other than, if necessary, to establish a depository account with the Bank to be used solely for disbursements in accordance with the Budget.

3.4 <u>Bank Loan Payments</u>. During the Tri-Party Forbearance Period, (a) the Bank shall be entitled to receive from the Company's deposit account normal and reasonable fees relating to the

5

Company's depository accounts and the proceeds of any sale, assignment or transfer of the Enterprise Priority Collateral, as such term is defined in the Intercreditor Agreement, (b) other than as set forth in subparagraph (a) herein, the Bank agrees it will not demand or accept any payments of principal, interest, fees or reimbursement for costs and expenses from the Company, nor any reduction of any indebtedness of the Company to the Bank, on account of any obligations owed by the Company to the Bank and (c) the Company agrees that, other than as set forth in subparagraph (a) herein, it will not make any payments of principal, interest, fees or reimbursement for costs and expenses to the Bank, nor any reduction of any indebtedness of the Company to the Bank, on account of any obligations owed by the Company to the Bank.

3.5   White Oak Loan Payments. During the Tri-Party Forbearance Period, (a) the Company shall pay, and White Oak shall be permitted to receive from the Proceeds Account and retain, regularly scheduled payments of interest for the current month when due (but not for any past due payments for prior months or prepayments for future months) due and owing on the Company's obligations to White Oak, and (b) in the event the Company's Collections exceed the Collections as set forth on the Budget due to New Sales or Collections not included in the Budget, which are the proceeds of the FedNat Priority Collateral, as such term is defined in the Intercreditor Agreement, White Oak shall be permitted to, immediately upon receipt of same, remit such excess Collections from the Proceeds Account to White Oak to be applied as a payment of the obligations owed by the Company to White Oak.

3.6   No Waiver; Reservation of Rights.

(a)   The Secured Creditors have not waived, are not by this Tri-Party Forbearance Agreement waiving and have no intention of waiving the Specified Defaults or any other Event of Default that has occurred as of the date hereof, that may be continuing as of the date hereof or that may occur after the date hereof, whether the same or similar to the Specified Defaults. Except with respect to the Specified Defaults as and to the extent expressly set forth in Section 3.2 above, the Secured Creditors have not agreed to forbear from exercising any of their respective rights or remedies concerning any Event of Default that may have occurred as of the date hereof, that may be continuing as of the date hereof or that may occur after the date hereof.

(b)   Subject to Section 3.2 above, the Secured Creditors reserve the right to exercise any or all of their respective rights and remedies under the Secured Creditors Loan Documents or otherwise as a result of any Event of Default (other than the Specified Defaults) that may be continuing on the date hereof or that may occur after the date hereof. White Oak has not waived any of such rights or remedies and nothing in this Tri-Party Forbearance Agreement, or any delay on its part in exercising any such rights or remedies, should be construed as a waiver of any such rights or remedies.

3.7   Intercreditor Agreement. Except as modified by the terms of this Tri-Party Forbearance Agreement, that certain Amended and Restated Intercreditor Agreement (the "Intercreditor Agreement") dated July 27, 2017 by and among the Secured Creditors and the Company remains in full force and effect and the Secured Creditors rights in the Collateral and the exercise of rights and remedies of the Secured Creditors remain subject to the terms and conditions of the Intercreditor Agreement.

6

SECTION 4.  REPRESENTATIONS, WARRANTIES AND COVENANTS

In addition to the continuing covenants and agreements at any time made by the Company and Guarantors to the Secured Creditors pursuant to the Secured Creditors Loan Documents, Company and Guarantors, jointly and severally represent, warrant and covenant with and to the Secured Creditors as follows (which representations, warranties and covenants are continuing and shall survive the execution and delivery hereof):

4.1  Authorization, Execution and Delivery.  This Tri-Party Forbearance Agreement has been duly authorized, executed and delivered by all necessary action on the part of the Company and Guarantors, and the agreements and obligations of the Company and Guarantors contained herein constitute legal, valid and binding obligations of the Company and Guarantors, enforceable in accordance with their respective terms.

4.2  Accuracy of Existing Representations and Warranties.  All of the representations and warranties set forth in the Secured Creditors Loan Documents, each as amended hereby, are true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such date.

4.3  No Default.  As of the Tri-Party Forbearance Effective Date, no Events of Default under the Secured Creditors Loan Documents exists or has occurred and is continuing other than the Specified Defaults.

4.4  Additional Defaults.   The parties hereto acknowledge, confirm and agree that any misrepresentation by the Company or Guarantor, or any failure of the Company or Guarantor to comply with the covenants, conditions and agreements contained in this Tri-Party Forbearance Agreement or in any other agreement, document or instrument at any time executed and/or delivered by the Company or Guarantor with, to or in favor of the Secured Creditors shall constitute an Event of Default under the Secured Creditors Loan Agreements and the other Secured Creditors Loan Documents, and shall not be subject to any cure or grace period.

SECTION 5.  SALE MILESTONES; BUDGET; ADDITIONAL REPORTING; ADDITIONAL COVENANTS AND AGREEMENTS.

5.1  Sale Milestones.  As a material inducement to the Secured Creditors to make enter into this Tri-Party Forbearance Agreement, the Company represents to the Secured Creditors that it has executed an agreement with an experienced advisor who is knowledgeable in assisting companies similar to the Company in the sale of patents  (the "**Broker**"), and there will be sufficient funds available from such sale transaction to fully pay and satisfied the Company's Obligations to the Internal Revenue Service and the Secured Creditors. Company and Guarantors acknowledge and agree their priority and intent is to sell the patents owned by the Company in a bona fide sale to a third party (the "**Sale**") within the sale milestones set forth herein and agree to not act in an unreasonable manner with regard to the negotiation of the sale price. Company and Guarantors agree in their efforts to sell the patents owned by the Company to a third party to comply with the following milestones (assuming there is not an occurrence of a Tri-Party Forbearance Termination Event prior to any such milestone):

7

(a) No later than March 31, 2020, the Company shall provide White Oak with proof, in form and substance acceptable to the Secured Creditors, that the Company and a bona fide third party buyer ("**Buyer**") have entered into an executed purchase agreement with a Buyer, which Sale shall be consummated no later than April 30, 2020 and provides for sufficient proceeds from such Sale to fully pay and satisfy all of the Company's indebtedness to the Internal Revenue Service and the Secured Creditors; and

(b) If the Company fails to comply with Subsection (a) hereinabove, then on April 1, 2020, the Company shall provide the Secured Creditors with proof, in form and substance acceptable to the Secured Creditors, of the Company entering into an agreement providing for the auction of registered patents, patent pendings and patent applications to be held no later than April 30, 2020, for sufficient proceeds from such auction to fully pay and satisfy all of the Company's indebtedness to the Internal Revenue Service and the Secured Creditors. The sale of the registered patents, patent pendings and patent applications by an auction shall be considered a Sale.

(c) If the Company shall fail to fully pay and satisfy White Oak on or before April 30, 2020, then commencing on May 1, 2020 the Company and the Guarantors shall pay to White Oak a late fee, in an amount equal to $25,000 for all or part of each 7 calendar day period thereafter until White Oak is fully paid and satisfied, which fee is fully earned, irrevocable and non-refundable on the date of this Tri-Party Forbearance Agreement and shall be due and payable on the date of the Sale.

5.2    Budget.

(a) Company and the Guarantors hereby acknowledge, confirm, and agree that the Company has prepared and delivered to the Secured Creditors a Budget, set forth on Exhibit A attached hereto, prepared by the Company's management, which sets forth for the Company, among other information, weekly cash flows, together with a written explanation of all assumptions relevant to the Budget, for the period commencing on December 30, 2019 through the Tri-Party Forbearance Termination Date. As a material inducement to the Secured Creditors to enter into this Tri-Party Forbearance Agreement the Company and the Guarantors represent to the Secured Creditors (i) they have used their best efforts to prepare the Budget and the information contained therein is true and accurate to the best of their knowledge and (ii) other than the advance made by White Oak to the Company pursuant to the Fifth Overadvance Letter, the Company will be able to pay its expenses from its own cash flow and will not require any additional borrowings from the Secured Creditors.

(b) During the Tri-Party Forbearance Period, the Company will deposit all proceeds of FedNat Priority Collateral, in the Lockbox which shall be transferred on a daily basis to the Proceeds Account. Once during each calendar week the Company shall be permitted to request (each a "**Funding Request**"), and White Oak shall remit from the Proceeds Account, up to the lesser of (i) the amount in the Proceeds Account, (ii) the amount of the Funding Request, (iii) an amount not to exceed to the Total Operating Expenses set forth on the Budget for such week or (iv) an amount not to exceed (A) the sum of the White Oak Accounts Amount plus the balance of Proceeds Account after the funding of the current Funding Request less (B) the White Oak Accounts Initial Amount.

(c) Not later than Tuesday of each week, commencing on January 7, 2020, the Company shall deliver or cause to be delivered to the Secured Creditors, in form and substance satisfactory to the Secured Creditors, a report that sets forth for the immediately preceding week a comparison of the Company's actual financial results on a line-by-line basis of the Budget for such week to the Company's' projections for each line on the Budget for such week and for the period commencing on December 30, 2019 to the end of the current week, all as set forth in the Budget, together with a statement that no Material Budget Deviation (as defined herein) has occurred.

(d) Company and Guarantors hereby confirm, acknowledge and agree that (i) it shall constitute an additional Tri-Party Forbearance Termination Event if, at any time (i) the Company's actual New Sales, Collections, Total Operating Expenses, Ending Cash and WOBC Ending Balance negatively deviates from the Budget by more than fifteen percent (15%) for any 2-week period or in the aggregate from the Tri-Party Forbearance Effective Date to the end of the current week being reported, beginning with the 2-week period ending on January 12, 2020, (ii) any failure of the Company to deliver any reports with respect to the Budget as required above shall constitute an additional Tri-Party Forbearance Termination Event and (iii) the Secured Creditors are relying upon the Company's delivery of, and compliance with, the Budget in determining to enter into this Tri-Party Forbearance Agreement.

5.3 Additional Reporting.

(a) Not later than 10:00 a.m. (Eastern Time) on the Tuesday following the end of each week and with each request for a disbursement from the Proceeds Account, a report of the White Oak Accounts Amount together with the reconciliation from the prior week or last submission, as applicable, together with copies of invoices for New Sales.

(b) Not later than 10:00 a.m. (Eastern Time) on the Tuesday following the end of each week, the Company will send to the Secured Creditors a detailed aging of its accounts receivable and accounts payable in a form acceptable to the Secured Creditors.

(c) The Company shall provide the Secured Creditors with access at any time to view its depository accounts and on each Business Day shall provide the Secured Creditors with a report of the previous Business Day's actual New Sales, Collections and Total Operating Expenses.

(d) Not later than 10:00 a.m. (Eastern Time) on the Tuesday following the end of each week, a report by the Company of the amount of all debt for borrowed money and equipment leases owed by the Company and a summary of the status of each debt.

(e) The Company and the Broker shall provide the Secured Creditors with copies of all drafts of the documents related to the marketing and the Sale and any significant correspondence and discussions between the Broker and potential purchasers.

5.4 Updated Patent List and Patent Security Agreement. The Company shall provide the Secured Creditors with a list of its registered patents, patent pendings and patent applications. To the extent there are new patents that are not subject to the existing Patent Security Agreements, the Company agrees, immediately upon the request of the Secured Creditors, to execute an

9

amendment to the Patent Security Agreements to add such patents.

5.5 <u>Additional Debt</u>. The Company shall not be permitted to borrow money or incur any indebtedness, secured or unsecured, directly or indirectly, other than (a) trade payables incurred in the ordinary course of its business and in accordance with the Budget or (b) debt approved in writing by the Secured Creditors, in their sole discretion, prior to Company incurring such debt, which debt shall be (i) subordinate in payment, and if secured, in priority to the liens, of the Secured Creditors, (ii) the Company shall not make and the lenders of such subordinated debt shall not receive any payments of principal, interest, fees and costs until after the Secured Creditors are fully paid and satisfied and (iii) such other terms and conditions as the Secured Creditors shall require.

5.6 <u>Subordinated Debt Payments</u>. From and after the Tri-Party Forbearance Effective Date, the Company shall not be permitted to make any payments to its lenders other than the Secured Creditors as set forth in this Tri-Party Forbearance Agreement, and ordinary trade payables in accordance with the Budget.

SECTION 6. TERMINATION EVENTS.

Each of the following shall constitute a "**Forbearance Termination Event**" under this Tri-Party Forbearance Agreement:

6.1 The occurrence of an Event of Default under the Secured Creditors Loan Agreement or any of the other Secured Creditor Loan Documents, other than the Specified Defaults;

6.2 Any representation or warranty made or deemed made by the Company or Guarantors herein or which is contained in any certificate, document or financial or other statement furnished by them at any time under or in connection with this Tri-Party Forbearance Agreement shall prove to have been inaccurate in any material respect on or as of the date made or deemed made;

6.3 Company or Guarantors shall default in the observance or performance of any covenant or agreement contained in this Tri-Party Forbearance Agreement;

6.4 The commencement of any action or proceeding against the Secured Creditors or any affiliate of the Secured Creditors by Company or Guarantors or any entity controlled by or under common control with Company;

6.5 The White Oak Accounts Amount is less than the White Oak Accounts Initial Amount; and

6.6 The occurrence of any event which could reasonably be expected to result in a material adverse change in the Company's financial condition or operations or in any of the Company's business prospects as compared to the state of facts existing on the Tri-Party Forbearance Effective Date.

6.7 Failure by the Company to comply with Paragraph 5.3(e) of this Tri-Party Forbearance Agreement, which shall permit the Secured Creditors, in their sole discretion, after

three (3) Business Day's written notice to the other Secured Creditor, exercise all rights and remedies available to it under their respective Secured Creditors Loan Documents and the Intercreditor Agreement, and applicable law or in equity.

SECTION 7. INTENTIONALLY OMITTED.

SECTION 8. CONDITIONS TO EFFECTIVENESS. The effectiveness of the forbearance made pursuant to this Tri-Party Forbearance Agreement shall be subject to the receipt of an original (or electronic copy) of (a) this Tri-Party Forbearance Agreement duly authorized, executed and delivered by the Secured Creditors, the Company and Guarantors, by Secured Creditors, (b) the Fifth Overadvance Letter duly authorized, executed and delivered by the Company and Guarantors, to White Oak, (c) proof, in form and substance acceptable to the Secured Creditors, that Christopher Bossi has the requisite power and authority to negotiate and act on behalf of the Company with regard to this Tri-Party Forbearance Agreement, (d) proof, in form and substance acceptable to the Secured Creditors, of the security and safeguards in place to secure the patents and maintain the integrity of the systems and (e) a copy of the executed agreement between the Broker and the Company, together with written proof the Company has instructed the Broker to provide the Secured Creditors with unrestricted access to the Broker to discuss the Sale and obtain any and all information regarding the Sale directly from the Broker.

SECTION 9. RELEASES; RESERVATION OF RIGHTS. The Bank, the Company and the Guarantors acknowledge the Company and the Guarantors have granted a release to White Oak pursuant to the Fifth Overadvance Letter. No releases are being granted pursuant to this Tri-Party Forbearance Agreement. Secured Creditors hereby reserve all rights against each other. Upon the repayment in full of the Internal Revenue Service, the Bank and White Oak, the Bank, White Oak, the Company and the Guarantors shall exchange unconditional mutual releases.

SECTION 10. PROVISIONS OF GENERAL APPLICATION

10.1 Effect of this Tri-Party Forbearance Agreement. Except as modified pursuant hereto, no other changes or modifications to the Secured Creditors Loan Documents are intended or implied and in all other respects the Secured Creditors Loan Documents are hereby specifically ratified, restated and confirmed by all parties hereto as of the effective date hereof. To the extent of conflict between the terms of this Tri-Party Forbearance Agreement and the other Secured Creditors Loan Documents, the terms of this Tri-Party Forbearance Agreement shall control. Except as modified in this Tri-Party Forbearance Agreement, all other terms and conditions of the Secured Creditors Loan Documents remain in full force and effect.

10.2 Binding Agreement; No Third Party Beneficiaries. This Tri-Party Forbearance Agreement shall be binding upon and inure to the benefit of the Secured Creditors, the Company, Guarantors and their respective successors and assigns. This Tri-Party Forbearance Agreement is solely for the benefit of the Secured Creditors, the Company, Guarantors and their respective successors and assigns, and no other person shall have any right, benefit, priority or interest under, or because of the existence of, this Tri-Party Forbearance Agreement.

10.3 Right to Counsel. The Company and the Guarantors acknowledge that they have been afforded an opportunity and ample time to engage separate and independent counsel to represent

them and the Secured Creditors have recommended, prior to the execution of this Tri-Party Forbearance Agreement, that the Company and the Guarantors seek independent counsel to represent them in this matter since the Company's and the Guarantors' interests do in fact conflict with the interests of the Secured Creditors. Notwithstanding such actual conflict, by executing where indicated below, the Company and the Guarantors (a) acknowledge that they understand the terms of this Tri-Party Forbearance Agreement and (b) acknowledge that they are entering into this Tri-Party Forbearance Agreement voluntarily and after having been afforded an opportunity to review this Tri-Party Forbearance Agreement, including, without limitation, this Section 10.3, with attorneys of their own selection.

10.4 Rule of Construction. In the event of any dispute between the Parties, there shall not be employed the rule to construe ambiguity against the draftsman. This Tri-Party Forbearance Agreement has been fully negotiated between the parties.

10.5 Costs and Expenses. In addition to all other fees and expenses payable by the Company to the Secured Creditors under the Secured Creditors Loan Documents, the Company shall reimburse the Secured Creditors for all costs and expenses, including legal fees and expenses, incurred by the Secured Creditors in the structuring, negotiation, arrangement or preparation of this Tri-Party Forbearance Agreement and the agreements, documents and/or instruments to be executed in connection herewith or contemplated hereby.

10.6 Further Assurances. The parties hereto shall execute and deliver such additional documents and take such additional action as may be necessary or desirable to effectuate the provisions and purposes of this Tri-Party Forbearance Agreement.

10.7 Governing Law. The validity, interpretation and enforcement of this Tri-Party Forbearance Agreement whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the Commonwealth of Pennsylvania but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the Commonwealth of Pennsylvania.

10.8 **Waiver of Jury Trial. To the fullest extent permitted by applicable law, the Secured Creditors, the Company and Guarantors hereby irrevocably waive any right to trial by jury of any claim, demand, action or cause of action arising under this Tri-Party Forbearance Agreement or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this agreement or the transactions contemplated hereby, in each instance whether now existing or hereafter arising and whether in contract, tort, equity or otherwise.**

10.9 Counterparts. This Tri-Party Forbearance Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Tri-Party Forbearance Agreement by telefacsimile or other method of electronic transmission shall have the same force and effect as the delivery of an original executed counterpart of this Tri-Party Forbearance Agreement. In making proof of this Tri-Party Forbearance Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties thereto.

SECTION 11.  **CONFESSION OF JUDGMENT.** FOR THE PURPOSE OF OBTAINING POSSESSION OF THE COLLATERAL UPON THE OCCURRENCE OF ANY TRI-PARTY FORBEARANCE TERMINATION EVENT, THE COMPANY AND GUARANTORS HEREBY AUTHORIZE AND EMPOWER ANY ATTORNEY OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA OR ELSEWHERE AS ATTORNEY FOR THE COMPANY AND THE GUARANTORS AND ALL PERSONS CLAIMING UNDER OR THROUGH THE COMPANY AND THE GUARANTORS, TO SIGN AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN AMICABLE ACTION FOR POSSESSION OF THE COLLATERAL AND TO APPEAR FOR AND CONFESS JUDGMENT AGAINST THE COMPANY AND THE GUARANTORS, AND ALL PERSONS CLAIMING UNDER OR THROUGH THE COMPANY AND THE GUARANTORS IN FAVOR OF SECURED CREDITORS FOR RECOVERY BY SECURED CREDITORS OF POSSESSION THEREOF, FOR WHICH THIS TRI-PARTY FORBEARANCE AGREEMENT, OR A COPY THEREOF VERIFIED BY AFFIDAVIT, SHALL BE SUFFICIENT WARRANT; AND THEREUPON A WRIT OF POSSESSION MAY IMMEDIATELY ISSUE FOR POSSESSION OF THE COLLATERAL, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER AND WITHOUT ANY STAY OF EXECUTION. IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED IT SHALL BE DISCONTINUED, OR POSSESSION OF THE COLLATERAL SHALL REMAIN IN OR BE RESTORED TO THE COMPANY AND/OR THE GUARANTORS, SECURED CREDITOR SHALL HAVE THE RIGHT FOR THE SAME TRI-PARTY FORBEARANCE TERMINATION EVENT OR ANY SUBSEQUENT TRI-PARTY FORBEARANCE TERMINATION EVENT TO BRING ONE OR MORE FURTHER AMICABLE ACTIONS AS ABOVE PROVIDED TO RECOVER POSSESSION OF THE COLLATERAL. SECURED CREDITORS MAY BRING AN AMICABLE ACTION FOR POSSESSION BEFORE OR AFTER THE INSTITUTION OF PROCEEDINGS TO FORECLOSE ON THE COLLATERAL OR TO ENFORCE ANY SECURED CREDITORS LOAN DOCUMENTS, OR AFTER ENTRY OF JUDGMENT THEREON OR ON ANY SECURED CREDITORS LOAN DOCUMENT, OR AFTER A SHERIFF'S SALE OF THE COLLATERAL IN WHICH SECURED CREDITORS ARE THE SUCCESSFUL BIDDER, IT BEING THE UNDERSTANDING OF THE PARTIES THAT THE AUTHORIZATION TO PURSUE SUCH PROCEEDINGS FOR OBTAINING POSSESSION IS AN ESSENTIAL PART OF THE REMEDIES FOR ENFORCEMENT OF THIS TRI-PARTY FORBEARANCE AGREEMENT AND THE OTHER SECURED CREDITORS LOAN DOCUMENTS, AND SHALL SURVIVE ANY EXECUTION SALE TO SECURED CREDITORS.

12.  **DISCLOSURE OF CONFESSION OF JUDGMENT/ACTION UPON CONFESSED JUDGMENT TO COMPANY AND GUARANTORS**

(a)  COMPANY AND GUARANTORS UNDERSTAND THAT THIS AGREEMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION THAT WOULD PERMIT SECURED CREDITORS TO ENTER JUDGMENT AGAINST COMPANY AND GUARANTORS IN COURT, AFTER A DEFAULT UNDER THIS AGREEMENT, WITHOUT ADVANCE NOTICE TO COMPANY AND GUARANTORS AND WITHOUT OFFERING COMPANY AND GUARANTORS AN OPPORTUNITY TO

13

NOTICE AND TO A HEARING TO CONTEST THE VALIDITY OF ANY JUDGMENT OR OTHER CLAIMS THAT THE SECURED CREDITORS MAY ASSERT AGAINST COMPANY AND GUARANTORS UNDER THIS AGREEMENT, COMPANY AND GUARANTORS ARE KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVING THESE RIGHTS, INCLUDING ANY RIGHT TO ADVANCE NOTICE OF THE ENTRY OF JUDGMENT, AND COMPANY AND GUARANTORS EXPRESSLY AGREE AND CONSENT TO SECURED CREDITORS ENTERING JUDGMENT AGAINST COMPANY AND GUARANTORS BY CONFESSION AS PROVIDED FOR IN THE CONFESSION OF JUDGMENT PROVISION OF THIS AGREEMENT.

INITIALS: __RS__ VideoMining Corporation

INITIALS: __RS__ Rajeev Sharma

INITIALS: __VPS__ Vishnu Sharma


(b)     COMPANY AND GUARANTORS FURTHER UNDERSTAND THAT IN ADDITION TO GIVING THE SECURED CREDITORS THE RIGHT TO ENTER JUDGMENT AGAINST COMPANY AND GUARANTORS WITHOUT ADVANCE NOTICE OR A HEARING, THE CONFESSION OF JUDGMENT PROVISION IN THIS AGREEMENT ALSO CONTAINS LANGUAGE THAT WOULD PERMIT THE SECURED CREDITORS, AFTER ENTRY OF JUDGMENT, AGAIN WITHOUT EITHER ADVANCE NOTICE OR A HEARING, TO EXECUTE ON THE JUDGMENT BY FORECLOSING UPON, ATTACHING, LEVYING ON, TAKING POSSESSION OF OR OTHERWISE SEIZING COMPANY AND GUARANTORS' PROPERTY, IN FULL OR PARTIAL PAYMENT OF THE JUDGMENT. IN EXECUTING THIS AGREEMENT, BEING FULLY AWARE OF HIS/HER/ITS RIGHTS TO ADVANCE NOTICE AND A HEARING AFTER JUDGMENT IS ENTERED AND BEFORE EXECUTION ON THE JUDGMENT, COMPANY AND GUARANTORS ARE KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVING THESE RIGHTS, AND COMPANY AND GUARANTORS EXPRESSLY AGREE AND CONSENT TO SECURED CREDITORS IMMEDIATELY EXECUTING ON THE JUDGMENT, IN ANY MANNER PERMITTED BY APPLICABLE STATE AND FEDERAL LAW, WITHOUT GIVING COMPANY AND GUARANTORS ANY ADVANCE NOTICE.

INITIALS: __RS__ VideoMining Corporation

INITIALS: __RS__ Rajeev Sharma

INITIALS: __VPS__ Vishnu Sharma

(c)     AFTER HAVING READ AND DETERMINED WHICH OF THE FOLLOWING STATEMENTS ARE APPLICABLE, AND BY PLACING OUR INITIALS NEXT TO EACH STATEMENT THAT APPLIES, COMPANY AND GUARANTORS REPRESENT THAT:

4820-0476-1519, v. 5

\_\_\_\_\_ 1.   I was represented by my own legal counsel in connection with this Agreement.

\_\_\_\_\_ 2.   A representative of Secured Creditors specifically called the confession of judgment provision in this Agreement to my attention.

INITIALS: _RS_ VideoMining Corporation

INITIALS: _RS_ Rajeev Sharma

INITIALS: _VPS_ Vishnu Sharma

(d)   I FURTHER CERTIFY THAT EACH OF OUR ANNUAL INCOMES EXCEED $10,000.00, THAT THE INDEBTEDNESS WHICH IS THE SUBJECT OF THIS AGREEMENT IS AND WAS FOR A BUSINESS PURPOSE AND THAT WE RECEIVED A COPY OF THIS ENTIRE AGREEMENT, WHICH WAS FULLY COMPLETED, INCLUDING THESE DISCLOSURES, ACKNOWLEDGMENTS AND WAIVERS, AT THE TIME OF ITS EXECUTION.

INITIALS: _RS_ VideoMining Corporation

INITIALS: _RS_ Rajeev Sharma

INITIALS: _VPS_ Vishnu Sharma

[REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

4820-0476-1519, v. 5

IN WITNESS WHEREOF, the parties hereto have caused this Tri-Party Forbearance Agreement to be duly executed and delivered by their authorized officers as of the day and year first above written.

VIDEOMINING CORPORATION

By: _____
Name: Rajeev Sharma
Title: President

_____
RAJEEV SHARMA, Individually, as Guarantor

_____
VISHNU SHARMA, Individually, as Guarantor

WHITE OAK BUSINESS CAPITAL, INC.

By: _____
Name: Kysha Pierre-Louis
Title: Chief Credit Officer

ENTERPRISE BANK

By: _____
Name:
Title:

4820-0476-1519, v. 5

IN WITNESS WHEREOF, the parties hereto have caused this Tri-Party Forbearance Agreement to be duly executed and delivered by their authorized officers as of the day and year first above written.

VIDEOMINING CORPORATION

By:_____
   Name: Rajeev Sharma
   Title:  President


_____
RAJEEV SHARMA, Individually, as Guarantor


_____
VISHNU SHARMA, Individually, as Guarantor


WHITE OAK BUSINESS CAPITAL, INC.

By: /s/ Kysha Pierre-Louis
Name: Kysha Pierre-Louis
Title:   Chief Credit Officer


ENTERPRISE BANK

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Tri-Party Forbearance Agreement to be duly executed and delivered by their authorized officers as of the day and year first above written.

VIDEOMINING CORPORATION

By:_____
   Name: Rajeev Sharma
   Title: President


_____
RAJEEV SHARMA, Individually, as Guarantor


_____
VISHNU SHARMA, Individually, as Guarantor


WHITE OAK BUSINESS CAPITAL, INC.

By: _____
Name: Kysha Pierre-Louis
Title:  Chief Credit Officer

ENTERPRISE BANK

By: _____[signature]_____
Name: Joseph A. Fidler
Title: Sr. V.P. / In-House Counsel

<u>EXHIBIT A</u>
to
Tri-Party Forbearance Agreement

Budget

VideoMining Corporation
1st Quarter 2020 Cash Flow

| Week Ending => | Week 1 10-Jan | Week 2 17-Jan | Week 3 24-Jan | Week 4 31-Jan | Week 5 7-Feb | Week 6 14-Feb | Week 7 21-Feb | Week 8 28-Feb | Week 9 6-Mar | Week 10 13-Mar | Week 11 20-Mar | Week 12 27-Mar | Week 13 3-Apr | Week 14 10-Apr | Week 15 17-Apr | Week 16 24-Apr | Week 17 1-May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning A/R | $706,485 | $657,485 | $782,485 | $476,350 | $676,350 | $661,100 | $651,100 | $701,100 | $851,100 | $851,100 | $776,100 | $500,600 | $300,600 | $550,600 | $550,600 | $500,600 | $400,600 |
| New Sales | $0 | $125,000 | $0 | $200,000 | $0 | $0 | $50,000 | $150,000 | $0 | $50,000 | $50,000 | $0 | $250,000 | $0 | $0 | $50,000 | $150,000 |
| Sale of Patents | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,500,000 |
| Collections | ($49,000) | $0 | ($306,135) | $0 | ($15,250) | ($10,000) | $0 | $0 | $0 | ($125,000) | ($325,500) | ($200,000) | $0 | $0 | ($50,000) | ($150,000) | ($2,500,000) |
| Ending A/R | $657,485 | $782,485 | $476,350 | $676,350 | $661,100 | $651,100 | $701,100 | $851,100 | $851,100 | $776,100 | $500,600 | $300,600 | $550,600 | $550,600 | $500,600 | $400,600 | $550,600 |
| EXPENSES | | | | | | | | | | | | | | | | | |
| Payroll | $0 | $0 | $0 | $90,000 | $126 | $0 | $0 | $90,000 | $0 | $0 | $0 | $0 | $90,000 | $0 | $0 | $0 | $0 |
| Benefits | $0 | $0 | $0 | $12,500 | $9 | $0 | $0 | $12,500 | $0 | $0 | $0 | $0 | $12,500 | $0 | $0 | $0 | $0 |
| Professional Services | $0 | $0 | $0 | $12,000 | $0 | $0 | $0 | $12,000 | $0 | $0 | $0 | $0 | $12,000 | $0 | $0 | $0 | $0 |
| Taxes | $0 | $11,500 | $0 | $0 | $0 | $30,000 | $11,500 | $0 | $0 | $30,000 | $11,500 | $0 | $0 | $30,000 | $11,500 | $0 | $0 |
| Operating Expenses | $145,000 | $16,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 |
| TOTAL OPERATING EXPENSES | $145,000 | $27,500 | $8,000 | $122,500 | $8,135 | $38,000 | $19,500 | $122,500 | $8,000 | $38,000 | $19,500 | $8,000 | $122,500 | $38,000 | $19,500 | $8,000 | $8,000 |
| Reserve Account Beginning Cash | $149,000 | $53,000 | $25,500 | $323,635 | $201,135 | $208,250 | $180,250 | $160,750 | $38,250 | $30,250 | $117,250 | $423,250 | $615,250 | $492,750 | $454,750 | $485,250 | $627,250 |
| Collections | $49,000 | $0 | $306,135 | $0 | $15,250 | $10,000 | $0 | $0 | $0 | $125,000 | $325,500 | $200,000 | $0 | $0 | $50,000 | $150,000 | $2,500,000 |
| Less Operating Expenses | ($145,000) | ($27,500) | ($8,000) | ($122,500) | ($8,135) | ($38,000) | ($19,500) | ($122,500) | ($8,000) | ($38,000) | ($19,500) | ($8,000) | ($122,500) | ($38,000) | ($19,500) | ($8,000) | ($2,123,703) |
| Ending Cash Balance | $53,000 | $25,500 | $323,635 | $201,135 | $208,250 | $180,250 | $160,750 | $38,250 | $30,250 | $117,250 | $423,250 | $615,250 | $492,750 | $454,750 | $485,250 | $627,250 | $1,003,547 |
| WOBC Opening Balance | $875,745 | $1,357,592 | $1,360,118 | $1,362,644 | $1,365,171 | $1,367,697 | $1,370,223 | $1,372,749 | $1,375,275 | $1,377,802 | $1,380,328 | $1,382,854 | $1,385,380 | $1,387,906 | $1,390,432 | $1,392,959 | $1,395,485 |
| Estimated Interest, Fees, etc. | $481,847 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $2,526 | $102,526 |
| Payments | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($1,498,011) |
| WOBC Ending Balance | $1,357,592 | $1,360,118 | $1,362,644 | $1,365,171 | $1,367,697 | $1,370,223 | $1,372,749 | $1,375,275 | $1,377,802 | $1,380,328 | $1,382,854 | $1,385,380 | $1,387,906 | $1,390,432 | $1,392,959 | $1,395,485 | $0 |
| Enterprise Opening Balance | $601,038 | $606,596 | $607,290 | $607,983 | $608,677 | $609,370 | $610,064 | $610,757 | $611,451 | $612,144 | $612,838 | $613,531 | $614,225 | $614,918 | $615,612 | $616,305 | $616,999 |
| Estimated Interest, Fees, etc. | $5,558 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 | $694 |
| Payments | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($617,692) |
| Enterprise Ending Balance | $606,596 | $607,290 | $607,983 | $608,677 | $609,370 | $610,064 | $610,757 | $611,451 | $612,144 | $612,838 | $613,531 | $614,225 | $614,918 | $615,612 | $616,305 | $616,999 | $0 |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ending A/R | $657,485 | $782,485 | $476,350 | $676,350 | $661,100 | $651,100 | $701,100 | $851,100 | $851,100 | $776,100 | $500,600 | $300,600 | $550,600 | $550,600 | $500,600 | $400,600 | $550,600 |
| (plus) Ending Cash Balance | $53,000 | $25,500 | $323,635 | $201,135 | $208,250 | $180,250 | $160,750 | $38,250 | $30,250 | $117,250 | $423,250 | $615,250 | $492,750 | $454,750 | $485,250 | $627,250 | $1,003,547 |
| Total A/R + Cash | $710,485 | $807,985 | $799,985 | $877,485 | $869,350 | $831,350 | $861,850 | $889,350 | $881,350 | $893,350 | $923,850 | $915,850 | $1,043,350 | $1,005,350 | $985,850 | $1,027,850 | $1,554,147 |
| (less) Beginning A/R Balance | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $706,485 | $0 |
| Proceeds Account Availability | $4,000 | $101,500 | $93,500 | $171,000 | $162,865 | $124,865 | $155,365 | $182,865 | $174,865 | $186,865 | $217,365 | $209,365 | $336,865 | $298,865 | $279,365 | $321,365 | $1,554,147 |