FILED
3/12/20 5:37 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

**VIDEOMINING CORPORATION,**                    **Bankruptcy No. 20-20425-GLT**

   **Debtor.**                                  **Chapter 11**

**VIDEOMINING CORPORATION,**                    **Document No.**

   **Movant,**                                  **Related to Doc. Nos. 13,**

vs.

                                                **Hearing Date and Time:**
**ENTERPRISE BANK, WHITE OAK**                  **March 12, 2020 at 3:30 p.m.**
**BUSINESS CAPITAL, INC., ON DECK**
**CAPITAL, ITRIA VENTURES, LLC,**
**BROADWAY ADVANCE FUNDING,**
**GREEN NOTE CAPITAL PARTNERS, INC.,**

   **Respondents.**

**FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL
<u>THROUGH MAY 8, 2020</u>**

AND NOW, after notice and hearing on the Emergency Motion of the Debtor for

Authorization to use Cash Collateral, and the Internal Revenue Service of the United

States ("IRS"), White Oak Business Capital, Inc. ("White Oak") and Enterprise Bank

("Enterprise" and together with the IRS and White Oak individually and collectively

referred to herein as the "Secured Creditors") having claimed liens thereon, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

(1) Debtor shall be, and hereby is, authorized on a final basis to utilize the cash

collateral in the operation of its business and in accordance with the budget attached

hereto as Exhibit A to its Emergency Motion for Interim and Final Orders Authorizing the

Debtor to Use Cash Collateral (the "Initial Budget"). Within ten (10) days prior to the

expiration of the Initial Budget and each budget provided thereafter (collectively, with the Initial Budget, individually and collectively referred to as the "Budgets"), the Debtor shall provide the Secured Creditors with a 13 week cash flow budget commencing with the week following the expiration of the then current Budget. To the extent the Secured Creditors agree with the form and substance of the Budgets submitted after the Initial Budget, this FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL THROUGH MAY 8, 2020 (the "Final Cash Collateral Order") shall be extended for such additional 13 week periods upon the same terms and conditions of this Final Cash Collateral Order. In the event the Secured Creditors and the Debtor are unable to agree upon a new Budget, upon not less than three (3) Business Days' notice, there shall be a hearing before the Court to attempt to resolve the issues. The Debtor shall be permitted a variance of 15% of the budgeted amount of total weekly operating expenses and a variance of 10% of the budgeted amount of post-petition sales on a trailing 4 week basis to be tested every 2 weeks commencing with the week ending on February 21, 2020. Said authorization shall be valid through and including May 8, 2020. In the event the Debtor's actual financial results negatively deviate from the variances described above, the Secured Creditors may make a motion to the Court on shortened time to revoke the Debtor's use of cash collateral.

(2)  All payments from Debtor to Robert O Lampl Law Office shall be deposited and held in trust in the escrow account of Robert O Lampl Law Office until such payments, and the fees and expenses related thereto, are approved by the entry of a Court Order approving the relevant fee application of Robert O Lampl law Office.

(3) The Pre-Petition liens of the Secured Creditors are hereby continued post-petition to the same extent, priority and validity as existed prior to the within bankruptcy on all assets including but not limited to the Debtor's post-petition receivables, except as otherwise specified herein and in the Interim Order Authorizing Debtor to Obtain Post-Petition Financing (the "Interim DIP Order") and any final order relating thereto (collectively, with the Interim DIP Order, the "DIP Orders").

(4) The value of the Secured Creditors' liens shall not be greater post-petition than the value thereof at the time of the filing of the bankruptcy petition initiating this case, plus accruals thereafter and minus payments to the Secured Creditors thereafter. No additional financing statements or mortgages need be filed to perfect such post-petition liens and security interests.

(5) The Debtor shall promptly pay to White Oak 30% of the collected amount of all Pre-Petition receivables and all post-petition receivables created prior to the entry of the Interim DIP Order.

(6) The Debtor shall pay the IRS adequate protection payments in an amount equal to Seven Thousand Five Hundred Dollars ($7,500) per month commencing on the first day of April and continuing on the first day of each month thereafter so long as the Final Cash Collateral Order remains in effect.

(7) The Debtor shall participate in a weekly conference call with the Secured Creditors and their advisors during which the Debtor shall provide details regarding its performance and compliance with the Budgets.

(8) The Debtor shall provide White Oak's consultant, Clear Thinking Group, LLC ("CTG") and Enterprise with access to view its books and records and make personnel

of the Debtor available to CTG and Enterprise's reasonable requests to discuss the Debtor's financial, operational and sale process results.

(9). The Debtor executed an agreement to employ Ocean Tomo (the "Broker") prior to February 28, 2020 to market all or substantially all of its patent portfolio, as the Debtor deems appropriate in its reasonable business judgment, and the Broker has commenced working for the Debtor. The Debtor shall promptly file an application with the Court to approve the broker's employment.

(10) Pursuant to a further Order of the Court, the Debtor shall enter into a bona fide sales agreement with a third-party for the sale of some or all of its assets on or before August 21, 2020, the consideration of which shall be sufficient to pay the claims of White Oak and Enterprise, including the claims of Enterprise in its capacity as the post-petition lender pursuant to the DIP Orders, and any other lienholder having a lien superior to White Oak and Enterprise on the assets being sold, in full. In the event the Debtor has not entered into such sales agreement by August 21, 2020, the Debtor will immediately commence and conduct an auction process for its patent assets which auction shall occur on or before September 30, 2020, with a reputable broker who regularly conducts auctions of assets similar to the Debtor's patents. White Oak and Enterprise reserve their right to object to any such sale. The rights, defenses and objections of all parties are specifically preserved in full with respect to the final DIP order, the value of the Debtor's assets, the approval of a sale process and auction process, and all terms and conditions of the same including whether to provide DIP financing or agree to the relief requested in such motions, or not.

(12) Enterprise is authorized and directed to continue to service the Debtor's direct deposit or other accounts maintained by Enterprise (the "Bank Account") as an account of the debtor-in-possession, and to receive, process, honor, and pay, to the extent funds are available, any and all checks, drafts, wire transfers, ACH transfers or other requested debits (collectively the "Debits") which are drawn on the Bank Account, whether dated on, before, or after the Petition Date, whether for obligations arising before or after the Petition Date, including Pre-Petition payroll and associated payroll taxes, which the Debtor represents such amounts are in compliance with the Budget and the Bankruptcy Code. The Debtor will instruct Enterprise as to which Debits are not authorized by Court Order or the Bankruptcy Code and should not be honored. Except for those Debits that are authorized by an Order of this Court or the Bankruptcy Code, the Debtor shall not instruct or request Enterprise to pay or honor any Debtor issued checks prior to the Petition Date, or for an obligation arising prior to the Petition Date.

(13) The IRS, White Oak and Enterprise are hereby each granted and entitled to a super priority administrative expense claim (each a "Super-Priority Claim") pursuant to section 507(b) of the Bankruptcy Code, with priority over all other administrative expense claims with the exception of the super priority administrative expense claim granted to Enterprise pursuant to the DIP Orders and any administrative expense claims asserted by any of the Debtor's Court approved professionals. The Super-Priority Claims shall be limited in amount to the diminution in value of their interests in and to their respective collateral existing as of the Petition Date which occurs during this case.

(14) Notwithstanding anything herein, including, without limitation, paragraphs 15 and 16 hereof, or in the DIP Orders to the contrary, the priorities of the Secured

Creditors' post-petition liens and Super Priority Claims in the post-petition accounts receivable shall be in the following order:

| Accounts Receivable created during the following dates: | 1st Priority | 2nd Priority | 3rd Priority | 4th Priority |
|---|---|---|---|---|
| Petition Date to March 3, 2020 | White Oak | Enterprise | IRS | |
| March 3, 2020 to Date of entry of this Final Cash Collateral Order | Enterprise (with respect to the obligations under the DIP Loans (as defined in the DIP Orders)) | White Oak | IRS | Enterprise (with respect to the Enterprise Pre-Petition Obligations) |
| After the entry of this Final Cash Collateral Order | Enterprise (with respect to the obligations under the DIP Loans (as defined in the DIP Orders)) | IRS | White Oak | Enterprise (with respect to the Enterprise Pre-Petition Obligations) |

(15)   To secure the Pre-Petition obligations under the White Oak Loan Documents (as defined in White Oak's Objection to the Motion) (the "White Oak Pre-Petition Obligations"), the Debtor granted White Oak (the "White Oak Pre-Petition Liens") a valid first priority lien on all assets defined as the FedNat Priority Collateral in that certain Amended and Restated Intercreditor Agreement (the "Intercreditor Agreement"), dated as of July 27, 2017, and a second priority on all other assets and all proceeds and products of such assets (the "White Oak Pre-Petition Collateral"). The Debtor only acknowledges, admits, represents, stipulates and agrees that:

a)      To secure the White Oak Pre-Petition Obligations, the Debtor granted White Oak the Pre-Petition Liens upon and in the White Oak Pre-Petition Collateral.

b)      As of the Petition Date, the Debtor is liable to White Oak in respect of the White Oak Pre-Petition Obligations under the White Oak Loan Documents for (i) the aggregate principal amount of $875,745.00 plus (ii) unpaid interest, fees, expenses, disbursements, indemnifications, obligations and charges in the amount of $534,173.38.

c)      As of the Petition Date, all of the White Oak Pre-Petition Obligations are unconditionally due and owing by the Debtor to White Oak.

d)      As of the Petition Date, all claims in respect of the White Oak Pre-Petition Obligations (i) constitute legal, valid, binding and nonavoidable obligations of the Debtor and (ii) are not, and shall not be, subject to any avoidance, disallowance, disgorgement, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges of any kind or nature under the Bankruptcy Code or any other applicable law or regulation. Any and all challenges by the Debtor (a) to the validity, sufficiency, priority or amount of the White Oak Pre-Petition Obligations or the White Oak Pre-Petition Liens; (b) the perfection of White Oak's security interests and liens in the White Oak Pre-Petition Collateral, as and to the extent applicable; and (c) any and all transfers received by White Oak prior to the Petition Date with respect to the White Oak Pre-Petition Obligations, including, but not limited to, claims or challenges pursuant to Sections 506(c), 544, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code, shall be forever barred. The Debtor does not possess, shall not assert, hereby forever releases, and is forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in

any way affect the validity, enforceability and non-avoidability of any of the White Oak Pre-Petition Obligations or liens and security interest securing the same.

e)      The White Oak Pre-Petition Liens (i) constitute valid, binding, enforceable, non-avoidable and properly perfected liens on the White Oak Pre-Petition Collateral that, prior to the entry of this Final Order, were senior in priority over any and all other liens on the Pre-Petition Collateral, subject only to those liens explicitly permitted by the White Oak Loan Documents or the Intercreditor Agreement and any liens of the IRS entitled to priority as a matter of law (collectively, the "Permitted Priority Liens"); and (ii) shall not be subject to avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation.

f)      White Oak is not and shall not be deemed to be a control person or insider of the Debtor by virtue of any of the actions taken by such party in respect of or in connection with the White Oak Loan Documents.

g)      As of the Petition Date, the Debtor has not brought, is not aware of, and has, no claims, objections, challenges, causes of action, including without limitation avoidance claims under chapter 5 of the Bankruptcy Code, against White Oak arising out of or related to the White Oak Loan Documents or otherwise.

h)      As of the Petition Date, there were no liens or security interests superior to the Permitted Priority Liens and the Enterprise Pre-Petition Liens.

(16)   To secure the Pre-Petition obligations under the Enterprise Loan Documents (as defined in the Intercreditor Agreement) (the "Enterprise Pre-

Petition Obligations"), the Debtor granted Enterprise (the "Enterprise Pre-Petition Liens") a valid first priority lien on all assets defined as the Enterprise Priority Collateral in the Intercreditor Agreement, consisting of substantially all assets of the Debtor other than accounts, and a second priority on the FedNat Priority Collateral (as defined in the Intercreditor Agreement), consisting primarily of accounts, and all proceeds and products of such assets (the "Enterprise Pre-Petition Collateral"). The Debtor only acknowledges, admits, represents, stipulates and agrees that:

a)    To secure the Enterprise Pre-Petition Obligations, the Debtor granted Enterprise the Enterprise Pre-Petition Liens upon and in the Enterprise Pre-Petition Collateral.

b)    As of the Petition Date, the Debtor is liable to Enterprise in respect of the Enterprise Pre-Petition Obligations under the Enterprise Loan Documents for (i) the principal amount of  $601,037.79 plus (ii) unpaid interest, fees, expenses, disbursements, indemnifications, obligations and charges due or owing under the Enterprise Loan Documents or applicable law . As of the Petition Date, all of the Enterprise Pre-Petition Obligations are unconditionally due and owing by the Debtor to Enterprise.

c)    As of the Petition Date, all claims in respect of the Enterprise Pre-Petition Obligations (i) constitute legal, valid, binding and nonavoidable obligations of the Debtor and (ii) are not, and shall not be, subject to any avoidance, disallowance, disgorgement, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise),

counterclaims, cross-claims, defenses or any other challenges of any kind or nature under the Bankruptcy Code or any other applicable law or regulation. Any and all challenges by the Debtor (a) to the validity, sufficiency, priority or amount of the Enterprise Pre-Petition Obligations or the Enterprise Pre-Petition Liens; (b) the perfection of Enterprise's security interests and liens in the Enterprise Pre-Petition Collateral, as and to the extent applicable; and (c) any and all transfers received by Enterprise prior to the Petition Date with respect to the Enterprise Pre-Petition Obligations, including, but not limited to, claims or challenges pursuant to Sections 506(c), 544, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code, shall be forever barred. The Debtor does not possess, shall not assert, hereby forever releases, and is forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Enterprise Pre-Petition Obligations or liens and security interest securing the same.

d)    The Enterprise Pre-Petition Liens (i) constitute valid, binding, enforceable, non-avoidable and properly perfected liens on the Enterprise Pre-Petition Collateral that, prior to the entry of this Final Order, were senior in priority over any and all other liens on the Enterprise Pre-Petition Collateral, subject only to those liens explicitly permitted by the Enterprise Loan Documents or the Intercreditor Agreement and any other Permitted Priority Liens entitled to priority as a matter of law; and (ii) shall not be subject to avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise),

counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation.

e)     Enterprise is not and shall not be deemed to be a control person or insider of the Debtor by virtue of any of the actions taken by such party in respect of or in connection with the Enterprise Loan Documents.

f)     As of the Petition Date, the Debtor has not brought, is not aware of, and has, no claims, objections, challenges, causes of action, including without limitation avoidance claims under chapter 5 of the Bankruptcy Code, against Enterprise arising out of or related to the Enterprise Loan Documents or otherwise.

g)     As of the Petition Date, there were no liens or security interests superior to the Permitted Priority Liens and the White Oak Pre-Petition Liens..

(17) The Debtor's right to use the Cash Collateral shall terminate immediately upon the earlier of (i) May 8, 2020, unless such date is extended by agreement among the Secured Creditors and the Debtor pursuant to paragraph 1 of this Final Cash Collateral Order; (ii) the expiration of the then current Budget; (iii) failure of the Debtor to make any payment due to the Secured Creditors in accordance with paragraphs 5 or 6 of this Final Cash Collateral Order or any of the provisions of the DIP Orders; (iv) the date any material provision of this Final Cash Collateral Order shall for any reason cease to be valid and binding or the Debtor shall so assert in any pleading filed with the Court; (v) other than the liens permitted by this Final Cash Collateral Order, the date an application is filed by the Debtor for the approval of any superpriority claim or any lien in this Chapter 11 case which is *pari*

*passu* with or senior to the liens granted to the Secured Creditors pursuant to this Final Cash Collateral Order without the prior written consent of the affected Secured Creditor; (vi) the date this Chapter 11 case is converted to a Chapter 7 case, or a trustee or an examiner with expanded powers is appointed or elected; (vii) the date of the commencement of any action against White Oak or Enterprise with respect to the Pre-Petition Obligations or the Pre-Petition Liens; or (viii) the date White Oak receives a notice of default under the DIP Orders from Enterprise.

(18) In the event a Secured Creditor perceives the Debtor to be in default of paragraph 17 subparagraphs (iii) through (viii), the Secured Creditor shall provide written notice of the same by email to Debtor's Counsel and Debtor shall have 3 business days to cure the perceived default. In the event the perceived default remains uncured after 3 days from the receipt of the aforementioned written notice, the Secured Creditor shall file a Motion to Terminate the Debtor's use of cash collateral, which motion shall be heard on an expedited basis. The Debtor shall have authority to use cash collateral consistent with its Budgets unless and until the court enters an order terminating the Debtor's authority to use cash collateral.

(19) The acknowledgment by Debtor of the Pre-Petition Obligations and the liens, rights, priorities and protections granted to or in favor of White Oak in respect of the Pre-Petition Collateral as set forth herein and in the Pre-Petition Loan Documents shall be deemed a timely filed proof of claim on behalf of White Oak in this Chapter 11 Case.

(20)   The terms of the White Oak Loan Documents, the Enterprise Loan Documents, the Interim Cash Collateral Order and this Final Cash Collateral Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for use of cash collateral for debtors-in-possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and fair consideration.   The terms and conditions of the White Oak Loan Documents, the Interim Cash Collateral Order and this Final Cash Collateral Order have been negotiated in good faith and at arms' length by and among the Debtor, Enterprise, the IRS and White Oak with all parties being represented by counsel.   Any use of cash collateral by the Debtor under the terms of the Interim Cash Collateral Order and this Final Cash Collateral Order shall be deemed to have been allowed in good faith by White Oak, as that term is used in § 364(e) of the Bankruptcy Code.

(21)   The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor, its creditors and its Estate, as its implementation will, among other things, provide the Debtor with the necessary liquidity to (1) minimize disruption to the Debtor's businesses and on-going operations, (2) preserve and maximize the value of the Debtor's Estate for the benefit of all the Debtor's creditors, and (3) avoid immediate and irreparable harm to the Debtor, its creditors, its business, its employees, and its assets, including without limitation, its intellectual property.

(22) No costs or expenses of administration which have or may be incurred in this Chapter 11 case shall be charged against White Oak or Enterprise, their claims or their Collateral pursuant to § 506(c) of the Bankruptcy Code, without the prior written

consent of White Oak or Enterprise as the case may be, and no such consent shall be

implied from any other action, inaction or acquiescence by White Oak or Enterprise.


(23) White Oak and Enterprise reserves their right to "credit bid" as permitted

by the Bankruptcy Code, the amount of their claims arising under the terms of their

respective loan documents during any sale of all or substantially all of the Debtor's

assets, including without limitation, sales occurring pursuant to section 363 of the

Bankruptcy Code or included as part of any restructuring plan subject to confirmation

under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code.

(24) All terms and conditions of the Interim Cash Collateral Order not

modified by this Final Cash Collateral Order shall remain in full force and effect.

(25) Counsel for Debtor shall serve this Order on the Respondents, the 20

largest unsecured creditors of the Debtor, the United States Trustee and such other

parties, if any, as may be required by Bankruptcy Rule 4001 and Local Rule 4001.1-

4001.3.


(26) Notwithstanding anything provision to the contrary, and in accordance with
W.PA.LBR 4001-2(b)(1)(B), any releases or waivers contained within this order shall
become binding against the estate one hundred twenty (120) days from the date of this
order and unless a party in interest files a written objection prior to that date.



March 12, 2020

_____
Gregory L. Taddonio
United States Bankruptcy Judge

## AMENDED AND RESTATED INTERCREDITOR AGREEMENT

**THIS AMENDED AND RESTATED INTERCREDITOR AGREEMENT** (this "Agreement") dated July __, 2017 is entered into by and among **FEDERAL NATIONAL PAYABLES, INC.,** a Delaware corporation doing business as Federal National Commercial Credit, Inc. and having an address at 7315 Wisconsin Avenue, Suite 600W, Bethesda, Maryland 20814 ("FedNat"), **ENTERPRISE BANK,** having an address at 4091 Mount Royal Boulevard, Allison Park, Pennsylvania 15101 ("Enterprise"), and **VIDEOMINING CORPORATION,** a Delaware corporation having its principal place of business at 402 S. Allen Street, Suite 101, State College, Pennsylvania 16801 ("Borrower").

RECITALS:

A.    Borrower and FedNat are parties to that certain Amended and Restated Loan and Security Agreement dated July __, 2017 (as amended, restated, replaced and/or otherwise modified from time to time, the "FedNat Credit Agreement") which establishes a credit facility for loans and financial accommodations to and for the benefit of the Borrower, subject to the terms thereof.

B.    Borrower and Enterprise are parties to that certain Business Loan Agreement dated January 12, 2017 pursuant to which Enterprise has made certain loans to the Borrower in the original principal amount of $800,000 (as amended or otherwise modified from time to time, the "Enterprise Credit Agreement").

C.    The Borrower has granted to FedNat a lien on, and security interest in, substantially all of its assets and properties, regardless of when acquired, as security for the Obligations owing under the FedNat Credit Agreement, all as more particularly described in the FedNat Loan Documents (as defined below).

D.    The Borrower has granted to Enterprise a lien on, and security interest in, substantially all of its assets and properties, regardless of when acquired, as security for the Obligations owing under the Enterprise Credit Agreement, all as more particularly described in the Enterprise Loan Documents (as defined below).

E.    Enterprise and FedNat wish to set forth their agreement as to certain of their respective rights and obligations with respect to certain assets and properties of the Borrower and their respective Lien priority in such assets and properties.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

Section 1.    <u>Definitions.</u>

1.1    <u>General Terms.</u>  As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and the plural forms of the terms defined:

1

#996843

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§101 et seq.

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of Maryland.

"Collateral" means all assets and properties of Borrower of any kind whatsoever, real or personal, tangible or intangible and wherever located, and any proceeds thereof (to the extent directly related thereto) and upon which a Lien is now or hereafter granted or purported to be granted by Borrower in favor of FedNat or Enterprise, as security for all or any part of the FedNat Loan Obligations or the Enterprise Loan Obligations, as applicable.

"Distribution" means, with respect to any indebtedness, ownership interest or other obligations, (a) any payment or distribution by any Person of cash, securities or other property, by set-off or otherwise, on account of such indebtedness, ownership interest or obligation or (b) any redemption, purchase or other acquisition of such indebtedness, ownership interest or obligation by any Person.

"Documents" means, collectively, the FedNat Loan Documents and the Enterprise Loan Documents.

"Enforcement Action" means (i) any action by any Secured Creditor to foreclose on the Lien of such Person in any Collateral, (ii) any action by any Secured Creditor to take possession of, or sell or otherwise realize upon, or to exercise any other rights or remedies with respect to, any Collateral, including a sale or other disposition of any Collateral by Borrower with the consent of, or at the direction of, a Secured Creditor after the occurrence of an Event of Default, (iii) the acceleration of any Obligations, (iv) the taking of any other actions by a Secured Creditor to collect or enforce all or any part of the Obligations payable to such Secured Creditor or any claims in respect thereof against (x) Borrower or (y) any of its property or assets, including the taking of control or possession of any property or assets of Borrower or the sale or other disposition of any interest in such property or assets and/or (v) the commencement by any Secured Creditor of any legal proceedings or actions against or with respect to (x) Borrower or (y) any of its property or assets or any Collateral to facilitate the actions described in clauses (i), (ii) and (iii) above, including any Insolvency Proceeding and action to have the automatic stay lifted in any Insolvency Proceeding of Borrower; *provided* that the mere issuance of a default notice or the filing of any notice of or voting any claim in any Insolvency Proceeding involving Borrower shall not be deemed to be an Enforcement Action.

"Enterprise Priority Collateral Acceleration Trigger Event" shall have the meaning set forth in Section 2.4(b).

"Enterprise" shall have the meaning ascribed to it in the first paragraph set forth herein, and its successors and/or assigns.

"Enterprise Loan Documents" means the Enterprise Credit Agreement, all Related Documents (as such term is defined in the Enterprise Credit Agreement) and all other agreements, documents and instruments at any time executed and/or delivered by the Borrower or any other Person with, to or in favor of Enterprise in connection therewith or related thereto, in each case as amended, restated, supplemented or otherwise modified from time to time.

2

"Enterprise Loan Obligations" means all obligations, liabilities and indebtedness of every kind, nature and description owing by the Borrower to Enterprise evidenced by or arising under one or more of the Enterprise Loan Documents, whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, including principal, interest, charges, fees, costs, indemnities and reasonable expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, in each case whether now existing or hereafter arising, whether arising before, during or after the commencement of any Insolvency Proceeding with respect to the Borrower (and including the payment of any principal, interest, fees, costs or expenses which would accrue and become due but for the commencement of such Insolvency Proceeding, whether or not such amounts are allowed or allowable in whole or in part in any such Insolvency Proceeding), together with any amendments, modifications, renewals or extensions thereof. The Enterprise Loan Obligations shall be considered outstanding whenever any loan commitment under the Enterprise Loan Documents is outstanding or otherwise in effect and has not been terminated, whether or not any sums are outstanding in respect of such commitment.

"Enterprise Priority Collateral" means the Collateral other than the FedNat Priority Collateral.

"Enterprise Priority Collateral Proceeds" shall have the meaning set forth in Section 2.4(b).

"Event of Default" means each "Event of Default" or similar term, as such term is defined in any FedNat Loan Document or any Enterprise Loan Document.

"FedNat" shall have the meaning ascribed to it in the first paragraph set forth herein, and its successors and/or assigns.

"FedNat Acceleration Trigger Event" shall have the meaning set forth in Section 2.4(a).

"FedNat Credit Agreement" shall have the meaning set forth in the recitals hereto.

"FedNat Loan Agreement" means (i) the FedNat Credit Agreement and (ii) each loan, credit agreement or other instrument evidencing any replacement, substitution, renewal, or refinancing for the Obligations under FedNat Credit Agreement, in each case as the same may from time to time be amended, restated, supplemented, modified, replaced, substituted, renewed or refinanced.

"FedNat Loan Documents" means the FedNat Loan Agreement, all Loan Documents (as such term is defined in the FedNat Loan Agreement) and all other agreements, documents and instruments at any time executed and/or delivered by Borrower or any other Person with, to or in favor of FedNat in connection therewith or related thereto, in each case, as amended, restated, supplemented or otherwise modified from time to time.

"FedNat Loan Obligations" means all obligations, liabilities and indebtedness of every kind, nature and description owing by the Borrower to FedNat evidenced by or arising under the FedNat Loan Documents (including any FedNat Loan Obligations and all Obligations under the FedNat Loan Agreement), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, including principal, interest, charges, fees, costs, obligations in respect of hedging transactions or any cash management services, debit or credit cards, ACH transactions, deposit accounts or similar services, indemnities and expenses, however

3

evidenced, and whether as principal, surety, endorser, guarantor or otherwise, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the FedNat Loan Agreement whether arising before, during or after the commencement of any Insolvency Proceeding with respect to the Borrower (and including the payment of any principal, interest, fees, cost, expenses and other amounts which would accrue and become due but for the commencement of such Insolvency Proceeding whether or not such amounts are allowed or allowable in whole or in part in any such Insolvency Proceeding), together with any amendments, modifications, renewals or extensions thereof.  The FedNat Loans shall be considered to be outstanding whenever any loan commitment under any of the FedNat Loan Documents is outstanding or otherwise in effect and has not been terminated, whether or not any sums are outstanding in respect of such commitment.

"FedNat Loans" means any loans or advances outstanding under the FedNat Loan Documents.

"FedNat Priority Collateral" means all Collateral described on Schedule I.

"FedNat Proceeds" shall have the meaning set forth in Section 2.4(a).

"Insolvency Proceeding" means, as to Borrower, any of the following: (i) any case or proceeding with respect to such Person under the Bankruptcy Code or any other Federal or State bankruptcy, insolvency, reorganization or other law affecting creditors' rights or any other or similar proceedings seeking any stay, reorganization, arrangement, composition or readjustment of the obligations and indebtedness of Borrower, (ii) any proceeding seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers with respect to Borrower or any of its assets, (iii) any proceeding for liquidation, dissolution or other winding up of the business of Borrower or (iv) any assignment for the benefit of creditors or any marshalling of assets of Borrower.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including any conditional sale or title retention arrangement, any capitalized lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Obligations" means, collectively, the FedNat Loan Obligations and the Enterprise Loan Obligations, or either of them, as applicable.

"Paid in Full" or "Payment in Full" means, with respect to any Obligations, that: (a) all of such Obligations (other than contingent indemnification, gross-up and make-whole obligations as to which in each case no claim has been asserted) have been paid, performed or discharged in full, (b) no Person has any further right to obtain any loans, letters of credit, bankers' acceptances, or other extensions of credit under the documents relating to such Obligations, and (c) any and all letters of credit, bankers' acceptances or similar instruments issued under such documents have been cancelled and returned (or backed by stand-by letters of credit or cash collateralized in each case on terms and conditions satisfactory to the Secured Creditor) in accordance with the terms of such documents.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, association, joint-stock company, trust, unincorporated organization, joint venture, governmental authority or other regulatory body.

4

"Secured Creditors" means FedNat and Enterprise, collectively.

"Standstill Period" shall have the meaning set forth in Section 3.1(c).

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of Maryland.

1.2    Certain Matters of Construction.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement and section references are to this Agreement unless otherwise specified.  For purposes of this Agreement, the following additional rules of construction shall apply: (i) wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter; (ii) the term "including" shall not be limiting or exclusive, unless specifically indicated to the contrary; (iii) all references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations; and (iv) unless otherwise specified, all references to any instruments or agreements, including references to any of this Agreement and the Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof, in each case, made in accordance with the terms hereof.

Section 2.    Security Interests; Priorities.

2.1    Collateral.  FedNat hereby acknowledges and consents to the grant of a Lien encumbering the Collateral, including the FedNat Priority Collateral, in favor of Enterprise pursuant to the terms and conditions of the Enterprise Loan Documents as collateral for the Enterprise Loan Obligations.  Enterprise acknowledges and consents to the grant of a Lien encumbering the Collateral, including the Enterprise Priority Collateral, in favor of FedNat, pursuant to the terms and conditions of the FedNat Loan Documents.  Notwithstanding anything else in this Agreement to the contrary, FedNat further agrees that until the Enterprise Loan Obligations are Paid in Full, all Liens now or hereafter taken, held or acquired by Enterprise in the Enterprise Priority Collateral shall at all times be prior and superior to all Liens now held or hereafter acquired by FedNat in the Enterprise Priority Collateral.  Notwithstanding anything else in this Agreement to the contrary, Enterprise further agrees that until the FedNat Loan Obligations are Paid in Full, all Liens now or hereafter taken, held or acquired by Enterprise in the FedNat Priority Collateral shall at all times be subordinated for all purposes and in all respects to the Liens now held or hereafter acquired by FedNat in the FedNat Priority Collateral.  The priorities of the Liens provided in this Section 2.1 shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement or refinancing of any of the Obligations, nor by any action or inaction which any of the Secured Creditors may take or fail to take in respect of the Collateral.  The priorities set forth above are applicable irrespective of the order or time of attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting a Lien in favor of each Secured Creditor in any Collateral, and notwithstanding any conflicting terms or conditions which may be contained in any of the Documents.  Each Secured Creditor shall be solely responsible for perfecting and maintaining the perfection of its Lien in and to each item of Collateral.  The foregoing provisions of this Agreement are intended solely to govern the respective Lien priorities as among the Secured Creditors as to the Collateral and shall not impose on any Secured Creditor any obligations in respect of the disposition of proceeds of any such Collateral

5

that would conflict with prior perfected claims therein in favor of any other Person or any order or decree of any court or governmental authority or any applicable law. Except to the extent necessary to enforce its rights under tins Agreement, Enterprise agrees that it will not directly or indirectly contest or challenge the validity, perfection, priority or enforceability of the FedNat Loan Obligations, the FedNat Loan Documents and the Liens of FedNat in any of the Collateral, or the reasonableness of any action or failure to act by FedNat in respect of any of the Collateral, the FedNat Loan Obligations or otherwise. Except to the extent necessary to enforce its rights under this Agreement, FedNat agrees that it shall not directly or indirectly take any action to contest or challenge the validity, perfection, priority or enforceability of the Enterprise Loan Obligations, the Enterprise Loan Documents and the Liens of Enterprise in any of the Collateral, or the reasonableness of any action or failure to act by any Enterprise in respect of any of the Collateral, the Enterprise Loan Obligations or otherwise.

2.2    Proceeds of Collateral. Any FedNat Priority Collateral or proceeds thereof, that may be received by Enterprise prior to the Payment in Full of the FedNat Loan Obligations shall be segregated and held in trust and promptly paid over to FedNat in the same form as received, with any necessary endorsements, and Enterprise hereby authorizes FedNat to make any such endorsements as agent for Enterprise (which authorization, being coupled with an interest, is irrevocable). Any Enterprise Priority Collateral or proceeds thereof, that may be received by FedNat prior to the Payment in Full of the Enterprise Loan Obligations shall be segregated and held in trust and promptly paid over to Enterprise in the same form as received, with any necessary endorsements, and FedNat hereby authorizes Enterprise to make any such endorsements as agent for FedNat (which authorization, being coupled with an interest, is irrevocable).

2.3    Notice of Interest In Collateral: Further Assurances. This Agreement is intended, in part, to constitute an authenticated notification of a claim by FedNat and Enterprise to the other of an interest in the Collateral in accordance with the provisions of Sections 9-611 and 9-621 of the Uniform Commercial Code. Each Secured Creditor shall promptly execute and deliver from time to time any and all financing statements, subordination agreements and other documents and take such other action in each case as reasonably requested by the other Secured Creditor to the extent necessary to effectuate (or to further effectuate) the terms of this Agreement. Each Secured Creditor acknowledges and agrees that the other Secured Creditor has relied upon the Lien priority and other provisions hereof in entering into the Documents and in making funds available to the Borrower thereunder.

2.4    Payments.

(a)    In the event that Enterprise obtains or receives any payment or prepayment of the Enterprise Loan Obligations after receipt by Enterprise of a notice from FedNat of the occurrence of a default or event of default in respect of the FedNat Loan Obligations and acceleration of the FedNat Loan Obligations and FedNat's intention to take Enforcement Actions with respect to the Collateral ("FedNat Acceleration Trigger Event"), then to the extent such amounts constitute proceeds of the FedNat Priority Collateral (collectively, the "FedNat Proceeds"), Enterprise shall deliver such amounts to FedNat (and until such delivery shall hold such amounts in trust for FedNat), with any remaining amounts subject to recovery by FedNat in accordance with applicable law, all for application to the FedNat Loan Obligations.

(b)    In the event that FedNat obtains or receives any payment or prepayment of the FedNat Loan Obligations after receipt by FedNat of a notice from Enterprise of the occurrence of a default or event of default in respect of the Enterprise Loan Obligations and acceleration of the

6

#996843

Enterprise Loan Obligations and Enterprise's intention to take Enforcement Actions with respect to the Collateral ("Enterprise Priority Collateral Acceleration Trigger Event"), then to the extent such amounts constitute proceeds of the sale or disposition of Enterprise Priority Collateral (collectively, the "Enterprise Priority Collateral Proceeds"), FedNat shall deliver such amounts to Enterprise (and until such delivery shall hold such amounts in trust for Enterprise), with any remaining amounts subject to recovery by Enterprise in accordance with applicable law, all for application to the Enterprise Loan Obligations. Notwithstanding the provisions of this Section 2.4(b), FedNat shall have no obligation to turn over to Enterprise any Enterprise Priority Collateral Proceeds released by Enterprise to the Borrower or that Enterprise otherwise allows to be used by the Borrower to pay any creditor or other obligation of the Borrower, and Enterprise agrees that it will not condition such release or consent on the agreement of the Borrower to use such Enterprise Priority Collateral Proceeds to make payment to creditors other than FedNat.

Section 3.    Enforcement; Management of Collateral.

   3.1    Remedies; Prepayments.

        (a)    Until the Enterprise Priority Collateral Loan Obligations have been Paid in Full, FedNat shall not, without the prior written consent of Enterprise, take any Enforcement Action with respect to the Enterprise Priority Collateral, provided, however, that (i) nothing herein shall prohibit FedNat from accelerating all or any portion of the FedNat Loan Obligations in accordance with the terms of the FedNat Loan Documents without the consent of Enterprise and (ii) following the expiration of the Standstill Period (as defined below), FedNat may take an Enforcement Action with respect to the Enterprise Priority Collateral.

        (b)    Until the FedNat Loan Obligations have been Paid in Full, Enterprise shall not, without the prior written consent of FedNat, take any Enforcement Action with respect to the FedNat Priority Collateral, provided, however, that nothing herein shall prohibit Enterprise from accelerating all or any portion of the Enterprise Loan Obligations in accordance with the terms of the Enterprise Loan Documents without the consent of FedNat.

        (c)    All Enforcement Actions taken by the Secured Creditors hereunder shall at all times be and remain subject to the terms of this Agreement. Notwithstanding the foregoing, each Secured Creditor may, subject to the terms hereof, without the consent of the other Secured Creditor, file proofs of claim and vote such claims in any Insolvency Proceeding involving the Borrower or its respective assets.

        (d)    For purposes of this Agreement, "Standstill Period" shall mean the period (A) commencing on either (i) the date on which Enterprise receives written notice from FedNat of an Event of Default under the FedNat Loan Documents and FedNat's intention to take Enforcement Actions with respect to the Enterprise Priority Collateral (a "FedNat Enforcement Notice") or (ii) the date on which Enterprise provides written notice to FedNat of an Event of Default under the Enterprise Documents and Enterprise's intention to take Enforcement Actions with respect to the Enterprise Priority Collateral (a "Enterprise Enforcement Notice") and (B) ending upon the earliest to occur of (i) the date which is 90 days thereafter and (ii) the date of the commencement of any Insolvency Proceeding with respect to the Borrower or its assets.

        (e)    FedNat may, at its option at any time, take any action and exercise any right or remedy it deems appropriate with respect to FedNat Loan Obligations or FedNat Priority Collateral (or any other right, property or collateral security), at any time and from time to time

7

#996843

without notice to or the approval of Enterprise. FedNat shall exercise good faith diligent efforts to give prompt written notice to Enterprise of the commencement by FedNat of an Enforcement Action, but the rights and remedies of FedNat under this Agreement shall not be affected by any failure to give such notice, and FedNat shall suffer no liability for failing to do so except when any such failure to give notice shall have been in bad faith. Enterprise may, at their option at any time, take any action and exercise any right or remedy they deem appropriate with respect to Enterprise Loan Obligations or Enterprise Priority Collateral, at any time and from time to time without notice to or the approval of FedNat. Enterprise shall exercise good faith diligent efforts to give prompt written notice to FedNat of the commencement by Enterprise of an Enforcement Action, but the rights and remedies of Enterprise under this Agreement shall not be affected by any failure to give such notice, and Enterprise shall suffer no liability for failing to do so except when any such failure to give notice shall have been in bad faith.

(f)     Subject to the other terms and conditions of this Agreement, until the FedNat Loan Obligations are Paid in Full, FedNat shall have the exclusive right to manage, perform and enforce the terms of the Documents with respect to FedNat Priority Collateral, to exercise and enforce all privileges and rights thereunder according to its discretion and the exercise of its sole business judgment, including the exclusive right to take or retake control or possession of FedNat Priority Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate FedNat Priority Collateral and to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction. In addition, FedNat shall not take or cause to be taken any action, the purpose or effect of which is to make its Lien on the Enterprise Priority Collateral in respect of any FedNat Loan Obligation pari passu with or senior to, or to give FedNat any preference or priority relative to, the Liens with respect to the Enterprise Loan Obligations or Enterprise with respect to the Enterprise Priority Collateral. Subject to the other terms and conditions of this Agreement, until the Enterprise Loan Obligations are Paid in Full, Enterprise shall have the exclusive right to manage, perform and enforce the terms of the Documents with respect to Enterprise Priority Collateral, to exercise and enforce all privileges and rights thereunder according to its discretion and the exercise of its sole business judgment, including the exclusive right to take or retake control or possession of Enterprise Priority Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate Enterprise Priority Collateral and to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction. In addition, Enterprise shall not take or cause to be taken any action, the purpose or effect of which is to make its Lien on the FedNat Priority Collateral in respect of any Enterprise Loan Obligation pail passu with or senior to, or to give Enterprise any preference or priority relative to, the Liens with respect to the FedNat Loan Obligations or FedNat with respect to the FedNat Priority Collateral. In conducting any public or private sale under the Uniform Commercial Code, each Secured Party shall give the other Secured Party notice of such sale as may be required by the applicable Uniform Commercial Code; provided, however, that 10 days' notice shall be deemed to be commercially reasonable notice.

(g)     Until the termination of the Standstill Period, FedNat shall not, without the prior written consent of Enterprise, collect, take possession of, foreclose upon, or exercise any other rights or remedies with respect to the Enterprise Priority Collateral. Any foreclosure or other exercise of remedies by FedNat with respect to Enterprise Priority Collateral after the expiration of the Standstill Period shall be subject to the priorities set forth in this Agreement, and upon receipt of any proceeds of Enterprise Priority Collateral, FedNat shall, subject to the other provisions of this Agreement, remit the same to Enterprise to be applied to the Enterprise Loan Obligations. Nothing in this Agreement shall be construed to limit or impair in any way the right of (i) FedNat to

8

#996843

take an action in any proceeding, action or Insolvency Proceeding as it deems necessary in its good faith judgment to protect its interests in any such proceeding, action or Insolvency Proceeding, (ii) FedNat to join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to the Enterprise Priority Collateral initiated by Enterprise for the sole purpose of protecting FedNat's Lien on the Collateral, so long as it does not delay or interfere with the exercise by Enterprise of their rights under this Agreement, the Documents and under applicable law and (iii) FedNat to receive any remaining proceeds of the Enterprise Priority Collateral after the Enterprise Loan Obligations have been Paid in Full.  Until the FedNat Loan Obligations have been Paid in Full, Enterprise shall not, without the prior written consent of FedNat, collect, take possession of, foreclose upon, or exercise any other rights or remedies with respect to the FedNat Priority Collateral.  Any foreclosure or other exercise of remedies by Enterprise with respect to FedNat Priority Collateral consented to by FedNat shall be subject to the priorities set forth in this Agreement, and upon receipt of any proceeds of FedNat Priority Collateral, Enterprise shall, subject to the other provisions of this Agreement, remit the same to FedNat to be applied to the FedNat Loan Obligations.  Nothing in this Agreement shall be construed to limit or impair in any way the right of (i) Enterprise to take an action in any proceeding, action or Insolvency Proceeding as it deems necessary in its good faith judgment to protect its interests in any such proceeding, action or Insolvency Proceeding, (ii) Enterprise to join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to the FedNat Priority Collateral initiated by FedNat for the sole purpose of protecting Enterprise's Lien on the Collateral, so long as it does not delay or interfere with the exercise by FedNat of its rights under this Agreement, the Documents and under applicable law and (iii) Enterprise to receive any remaining proceeds of the FedNat Priority Collateral after the FedNat Loan Obligations have been Paid in Full.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall be deemed to prohibit FedNat from exercising any of its rights and remedies under FedNat Loan Documents with respect to FedNat Priority Collateral and nothing in this Agreement shall be deemed to prohibit Enterprise from exercising any of its rights and remedies under the Enterprise Loan Documents with respect to the Enterprise Priority Collateral.

      3.2    <u>Notices of Default</u>.  Each Secured Creditor shall give to the other Secured Creditor (or the agent therefor) concurrently with the giving thereof to the Borrower (i) a copy of any written notice by such Secured Creditor of an Event of Default under any of its Documents or a written notice of demand for payment from the Borrower, and (ii) a copy of any written notice sent by such Secured Creditor to the Borrower stating such Secured Creditor's intention to exercise any material enforcement rights or remedies against the Borrower, including written notice pertaining to any foreclosure on all or any material part of the Collateral or other judicial or non-judicial remedy in respect thereof, and any legal process served or filed in connection therewith; <u>provided</u> that the delay or failure of any Secured Creditor to give such required notice shall not result in any liability to such Secured Creditor or affect the enforceability of any provision of this Agreement, including the relative priorities of the Liens of the Secured Creditors as provided herein, and shall not affect the validity or effectiveness of any such notice as against the Borrower.

      3.3    <u>Waiver of Marshalling and Similar Rights</u>.  Each Secured Creditor, to the fullest extent permitted by applicable law, waives any requirement regarding, and agrees not to demand, request, plead or otherwise claim the benefit of, any marshalling, appraisement, valuation or other similar right that may otherwise be available under applicable law.  Neither Secured Creditor shall be required as a condition precedent to or concurrent with the taking of any Enforcement Action to enforce any obligation, guaranty or Lien given by the Borrower in any other rights, property or collateral security (other than the Collateral) or given by any other Person.

9

3.4    <u>Use and Access Rights</u>.  Enterprise hereby grants to FedNat and its designated agents and representatives, a royalty and rent free, non-exclusive license and lease to use and access, or permit the Borrower to use and access, the Enterprise Priority Collateral in order to assemble, package, inspect, complete production runs of inventory, take possession of, move, prepare, advertise for sale, sell, store or otherwise deal with the FedNat Priority Collateral (the "Use"); <u>provided</u>, that (a) the Use shall be for a period not to exceed 90 days after the date on which Enterprise gives notice to FedNat that it has obtained possession and control of such Enterprise Priority Collateral, <u>provided</u>, <u>however</u>, that if, at the end of such 90 day period, Enterprise has not taken any Enforcement Action with respect to the Enterprise Priority Collateral, such 90 day period shall be extended, to the extent necessary for the Use, until the <u>earlier</u> of (i) 5 days after Enterprise has notified FedNat that Enterprise has commenced an Enforcement Action with respect to the Enterprise Priority Collateral and (ii) the date that is 180 days after the date on which Enterprise gives notice to FedNat that it has obtained possession and control of such Enterprise Priority Collateral, (b) nothing contained in this <u>Section 3.4</u> shall restrict Enterprise from selling, assigning or otherwise transferring any Enterprise Priority Collateral necessary for the Use prior to (i) the expiration of the 90 day period described above if the purchaser, assignee or transferee agrees to be bound by the provisions of this <u>Section 3.4</u> or (ii) the expiration of any extended use period as described in <u>clause (a)</u> above and (c) Enterprise may permit any other party to use and/or access the Enterprise Priority Collateral so long as such use does not delay or interfere with FedNat's Use rights under this <u>Section 3.4</u>.  If FedNat elects to use the Enterprise Priority Collateral as provided in this <u>Section 3.4</u>, it shall take all reasonable efforts to avoid, to the extent reasonably practicable, interference with the operation of the Enterprise Priority Collateral or the disposition thereof.

3.5    <u>Release of Liens</u>.

(a)    (i) Upon any release, sale or disposition of FedNat Priority Collateral that results in the release of FedNat's lien on such FedNat Priority Collateral and that is (A) permitted pursuant to the terms of the FedNat Loan Documents and not prohibited under the Enterprise Loan Documents or (B) effected pursuant to an Enforcement Action initiated by or on behalf of FedNat, the lien of Enterprise on such FedNat Priority Collateral (but not on any proceeds of such FedNat Priority Collateral not required to be paid to FedNat) shall be automatically and unconditionally released, and (ii) upon any release, sale or disposition of Enterprise Priority Collateral that results in the release of the liens of Enterprise on such Enterprise Priority Collateral and that is (A) permitted pursuant to the terms of the Enterprise Loan Documents and not prohibited under the FedNat Loan Documents or (B) effected pursuant to an Enforcement Action initiated by or on behalf of Enterprise, the lien of FedNat on such Enterprise Priority Collateral (but not on any proceeds of such Enterprise Priority Collateral not required to be paid to Enterprise) shall be automatically and unconditionally released.

(b)    (i) Until the Payment in Full of the FedNat Loan Obligations, Enterprise shall promptly execute and deliver (or cause to be executed and delivered) such release documents and instruments and shall take such further actions as FedNat shall reasonably request to evidence any release of the lien described in Section 3.5(a)(i). Enterprise hereby appoints FedNat and any officer or duly authorized person of FedNat, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of Enterprise and in the name of Enterprise or in FedNat's own name provided, that such power of attorney may only be exercised if Enterprise has not executed and delivered or caused to be executed and delivered such release documents and instruments in a timely manner following a request from FedNat, and must be exercised in FedNat's reasonable discretion, solely for the purposes of carrying out the terms of Section 3.5(a)(i), to take any and all appropriate action and to execute and deliver any and all

10

documents and instruments as may be necessary or desirable to accomplish the purposes of Section 3.5(a)(i), including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer, which appointment, being coupled with an interest, is irremovable until the FedNat Loan Obligations have been Paid in Full, and (ii) until the Payment in Full of the Enterprise Loan Obligations, FedNat shall promptly execute and deliver (or cause to be executed and delivered) such release documents and instruments and shall take such further actions as Enterprise shall reasonably request to evidence any release of the lien described in Section 3.5(a)(ii).  FedNat hereby appoints Enterprise and any officer or duly authorized person of Enterprise, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of FedNat and in the name of FedNat or in Enterprise's own name; provided, that such power of attorney may only be exercised if FedNat has not executed and delivered or caused to be executed and delivered such release documents and instruments in a timely manner following a request from Enterprise, and must be exercised in Enterprise's reasonable discretion, solely for the purposes of carrying out the terms of Section 3.5(a)(ii), to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of Section 3.5(a)(ii), including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer, which appointment, being coupled with an interest, is irremovable until the Enterprise Loan Obligations have been Paid in Full.

3.6    Collateral in Possession.

(a)    In the event that Enterprise takes possession of or has "control" (as such term is used in the Code as in effect in each applicable jurisdiction) over any Enterprise Priority Collateral for purposes of perfecting its lien thereon, Enterprise shall be deemed to be holding such Collateral as gratuitous bailee or gratuitous agent for FedNat, solely for purposes of perfection of FedNat's security interest or lien; provided, however, that (i) if FedNat is knowingly in possession of any tangible possessory Collateral that is Enterprise Priority Collateral, FedNat shall promptly, without recourse or warranty, transfer possession thereof to Enterprise, and (ii) without limiting the preceding clause (i), neither Secured Creditor shall have any duty or liability to protect or preserve any rights pertaining to any of the Enterprise Priority Collateral for the other Secured Creditor, each Secured Creditor shall be entitled to act on the Enterprise Priority Collateral in accordance with the terms of this Agreement, and each Secured Creditor hereby waives and releases the other Secured Creditor from all claims and liabilities arising under its role as such gratuitous bailee or gratuitous agent, except for claims and liabilities arising from gross negligence or willful misconduct as finally determined under a final and non-appealable order of a court of competent jurisdiction.

(b)    In the event that FedNat takes possession of or has "control" (as such term is used in the Code as in effect in each applicable jurisdiction) over any FedNat Priority Collateral for purposes of perfecting its lien thereon, FedNat shall be deemed to be holding such Collateral as gratuitous bailee or gratuitous agent for Enterprise, solely for purposes of perfection of Enterprise's security interest or lien; provided, however, that (i) if Enterprise is knowingly in possession of any tangible possessory Collateral that is FedNat Priority Collateral, Enterprise shall promptly, without recourse or warranty, transfer possession thereof to FedNat, and (ii) without limiting the preceding clause (i), neither Secured Creditor shall have any duty or liability to protect or preserve any rights pertaining to any of the FedNat Priority Collateral for the other Secured Creditor, each Secured Creditor shall be entitled to act on the FedNat Priority Collateral in accordance with the terms of this Agreement, and each Secured Creditor hereby waives and releases the other Secured Creditor from all claims and liabilities arising under its role as such gratuitous bailee or gratuitous agent, except for

11

claims and liabilities arising from gross negligence or willful misconduct as finally determined under a final and non-appealable order of a court of competent jurisdiction.

(c)    After the Payment in Full of the Enterprise Loan Obligations, Enterprise shall deliver, or transfer control of, as applicable, without recourse or warranty, the remainder of the Enterprise Priority Collateral, if any, in its possession or under its control to the designee of FedNat (except as may otherwise be required by applicable law or court order).  After the Payment in Full of the FedNat Loan Obligations, FedNat shall deliver, or transfer control of, as applicable, without recourse or warranty, the remainder of the FedNat Priority Collateral, if any, in its possession or under its control to the designee of Enterprise (except as may otherwise be required by applicable law or court order).

(d)    It is understood and agreed that this Section is intended solely to assure continuous perfection of Secured Parties' security interests in and liens on the Collateral, and nothing in this Section shall be deemed or construed as altering the priorities or obligations set forth elsewhere in this Agreement

Section 4.    <u>Amendments to Documents.</u>

4.1    <u>Amendment of FedNat Loan Documents</u>.  FedNat may at any time and from time to time without the consent of or notice to Enterprise, without incurring liability to Enterprise and without impairing or releasing the obligations of Enterprise under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any of the terms of the FedNat Loan Obligations, or amend in any manner any agreement, note, guaranty or other instrument evidencing or securing or otherwise relating to the FedNat Loan Obligations.

4.2    <u>Amendments to Enterprise Loan Documents</u>.  Enterprise may at any time and from time to time without the consent of or notice to FedNat, without incurring liability to FedNat and without impairing or releasing the obligations of FedNat under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any of the terms of the Enterprise Loan Obligations, or amend in any manner any agreement, note, guaranty or other instrument evidencing or securing or otherwise relating to the Enterprise Loan Obligations.

Section 5.    <u>Bankruptcy Matters</u>.  This Agreement shall continue in full force and effect after the filing of any petition by or against the Borrower in an Insolvency Proceeding and all converted or succeeding cases in respect thereof, and all references herein to Borrower shall apply to the trustee for the Borrower and the Borrower as a debtor-in-possession.  Enterprise agrees not to object, contest, or support any other person objecting to or contesting, (a) any request by FedNat for adequate protection or any adequate protection provided to FedNat or (b) any objection by FedNat to any motion, relief, action or proceeding based on a claim of a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts to FedNat under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise. Notwithstanding anything contained in this Section 5, in any Insolvency Proceeding, (i) if FedNat is granted adequate protection consisting of additional collateral (with replacement Liens on such additional collateral) and superpriority claims in connection with any financing or use of cash collateral, and FedNat does not object to the adequate protection being provided to them, then in connection with any such financing or use of cash collateral Enterprise may seek or accept adequate protection (and FedNat agrees not to object to such adequate protection) consisting solely of (x) a replacement Lien on the same additional collateral, subordinated to the Liens securing the FedNat Loan Obligations and such financing on the same basis as the other Liens securing the Enterprise Loan Obligations are so subordinated to the FedNat

12

Loan Obligations under this Agreement and (y) superpriority claims junior in all respects to the superpriority claims granted to FedNat and (ii) in the event Enterprise seeks or accepts adequate protection in accordance with clause (i) above and such adequate protection is granted in the form of additional collateral, then Enterprise agrees that FedNat shall also be granted a senior Lien on such additional collateral as security for FedNat Loan Obligations and any such financing and that any Lien on such additional collateral securing the Enterprise Loan Obligations shall be subordinated to the Liens on such collateral securing the FedNat Loan Obligations and any such financing and any other Liens granted to FedNats as adequate protection, with such subordination to be on the same terms that the other Liens securing the Enterprise Loan Obligations are subordinated to FedNat Loan Obligations under this Agreement. Enterprise agrees that except as expressly set forth in this Section 5 it shall not seek or accept adequate protection without the prior written consent of FedNat. Enterprise shall not support or vote in favor of any plan of reorganization (and each shall be deemed to have voted to reject any plan of reorganization) unless such plan (a) pays off, in cash in full, all the FedNat Loan Obligations or (b) is accepted by and is supported by FedNat.

Section 6.     <u>Miscellaneous.</u>

6.1     <u>Termination; Absolute Obligation</u>.  This Agreement shall terminate and be of no further force and effect upon either (a) the Payment in Full of the FedNat Loan Obligations and the release by FedNat of its Liens on the Collateral, or (b) the Payment in Full of the Enterprise Loan Obligations and the release by Enterprise of its Liens on the Collateral.  Without limiting the right of any Secured Creditor to seek damages for any breach hereof or to otherwise enforce compliance with the terms hereof, no such Secured Creditor shall be prejudiced in its rights to enforce the subordination provisions contained in this Agreement in accordance with the terms hereof by reason of any action by it or any failure by it to act in accordance with the terms hereof.

6.2     <u>Successors and Assigns</u>.  This Agreement shall be binding upon each Secured Creditor and its respective successors and assigns and shall inure to the benefit of each Secured Creditor and its respective successors, participants and assigns.

6.3     <u>Authorization; Validity</u>.  Each Secured Creditor and The Borrower represents and warrants that it is authorized to enter into this Agreement.  Each Secured Creditor represents and warrants that this Agreement (a) has been duly executed and delivered on its behalf by an authorized officer or other authorized signer and (b) constitutes the valid and binding obligation of such Secured Creditor in accordance with its terms, except as enforcement hereof may be limited by applicable bankruptcy, reorganization, insolvency, fraudulent conveyance, moratorium or similar laws affecting the enforcement of creditor's rights, generally and by general principles of equity (regardless of whether enforcement is considered in a proceeding in law or equity).

6.4     <u>Notices</u>.  All notices and other communications provided for hereunder shall be in writing and shall be mailed, sent by overnight courier, telecopied, or delivered, as follows:

if to FedNat, at the following address:

Federal National Payables, Inc.
7315 Wisconsin Avenue
Suite 600W
Bethesda, Maryland  20814
Fax No.:  (301) 961-6460
Attention:  Kysha A. Pierre-Louis, Chief Credit Officer

13

#996843

with a copy to:

> Mandelbaum Salsburg
> 3 Becker Farm Road
> Suite 105
> Roseland, New Jersey 07068
> Attention: Jeffrey M. Rosenthal, Esq.
> Facsimile: (973) 325-7467

if to Enterprise, at the following address:

> Enterprise Bank
> 4091 Mount Royal Boulevard
> Allison Park, Pennsylvania 15101
> Fax: (412) 487-4622
> Attention: David D. Miller, Senior Vice President

with copy to:

> Enterprise Bank
> 4091 Mount Royal Boulevard
> Allison Park, Pennsylvania 15101
> Fax: (412) 487-4622
> Attention: Joseph A. Fidler, Esquire

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 6.4. All such notices and other communications shall be effective (i) if sent by registered mail, return receipt requested, when received or three Business Days after mailing, whichever first occurs, (ii) if telecopied, when transmitted and a confirmation is received, provided the same is on a Business Day and, if not, on the next Business Day, or (iii) if delivered by messenger or overnight courier, upon delivery, provided the same is on a Business Day and, if not, on the next Business Day.

     6.5    <u>Counterparts</u>. This Agreement may be executed by the parties hereto in several counterparts, and each such counterpart shall be deemed to be an original and all of which shall constitute together but one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission (including, without limitation, in "pdf or "tiff" format) shall be effective as delivery of a manually executed counterpart of this Agreement.

     6.6    <u>GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE COMMONWEALTH OF PENNSYLVANIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN THE COMMONWEALTH OF PENNSYLVANIA; PROVIDED THAT EACH SECURED CREDITOR SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA SITTING IN THE CITY OF PHILADELPHIA OR OF THE UNITED STATES

14

#996843

FOR THE WESTERN DISTRICT OF PHILADELPHIA, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, DEBTOR AND EACH SECURED CREDITOR CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.   DEBTOR AND EACH SECURED CREDITOR IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.   DEBTOR AND EACH SECURED CREDITOR WAIVE PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH COMMONWEALTH.

6.7     MUTUAL WAIVER OF JURY TRIAL.   THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH, THIS AGREEMENT OR THE TRANSACTIONS RELATED THERETO.

6.8     Amendments.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Person from the terms hereof, shall in any event be effective unless it is in writing and signed by FedNat and Enterprise.  In no event shall the consent of the Borrower be required in connection with any amendment or other modification of this Agreement.

6.9     No Waiver.  No failure or delay on the part of any Secured Creditor in exercising any power or right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.

6.10   Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provisions in any other jurisdiction.

6.11   Further Assurances.  Each Secured Creditor agrees to cooperate fully with each other party hereto to effectuate the intent and provisions of this Agreement and, from time to time, to execute and deliver any and all other agreements, documents or instruments, and to take such other actions, as may be reasonably necessary or desirable to effectuate the intent and provisions of this Agreement.

6.12   Headings.  The section headings contained in this Agreement are and shall be without meaning or content whatsoever and are not part of this Agreement.

6.13   Lien Priority Provisions.  This Agreement and the rights and benefits hereunder shall inure solely to the benefit of FedNat and Enterprise and their respective successors and permitted assigns and no other Person (including the Borrower, or any trustee, receiver, debtor in possession or bankruptcy estate in a bankruptcy or like proceeding) shall have or be entitled to assert rights or benefits hereunder.  Nothing contained in this Agreement is intended to or shall

15

impair the obligation of the Borrower to pay the Obligations as and when the same shall become due and payable in accordance with their respective terms, or to affect the relative rights of the creditors of the Borrower, other than FedNat and Enterprise as between themselves.

6.14   Credit Analysis.   The Secured Creditors shall each be responsible for keeping themselves informed of (i) the financial condition of the Borrower and all other endorsers, obligors and/or guarantors of the Obligations and (ii) all other circumstances bearing upon the risk of nonpayment of the Obligations. No Secured Creditor shall have any duty to advise any other Secured Creditor of information known to it regarding such condition or any such other circumstances. No Secured Creditor assumes any liability to any other Secured Creditor or to any other Person with respect to: (a) the financial or other condition of Borrower under any instruments of guarantee with respect to the Obligations, (b) the enforceability, validity, value or collectibility of the Obligations, any Collateral therefor, or any guarantee or security which may have been granted in connection with any of the Obligations or (c) the Borrower's title or right to transfer any Collateral or security.

6.15   Waiver of Claims.   To the maximum extent permitted by law, except as otherwise expressly provided in this Agreement, each Secured Creditor and the Borrower waives any claim it might have against the other Secured Creditor with respect to, or arising out of, any action or failure to act or any error of judgment, negligence, or mistake or oversight whatsoever on the part of such Secured Creditor or its directors, officers, employees or agents with respect to any exercise of rights or remedies under the Documents or any transaction relating to the Collateral except to the extent arising as a result of the gross negligence or willful misconduct of such Secured Creditor.   Neither Secured Creditors, nor any of their respective directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or, except as specifically provided herein, shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Borrower or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

6.16   Conflicts.   In the event of any conflict between the provisions of this Agreement and the provisions of the Documents, the provisions of this Agreement shall govern.

6.17   Representations.   Enterprise hereby represents and warrants to FedNat that it has the requisite power and authority under the Enterprise Loan Documents to enter into, execute, deliver and carry out the terms of this Agreement on behalf of itself, and that this Agreement shall be binding obligations of Enterprise, enforceable against Enterprise in accordance with its terms. FedNat hereby represents and warrants to Enterprise that it has the requisite power and authority under the FedNat Loan Documents to enter into, execute, deliver and carry out the terms of this Agreement, and that this Agreement shall be binding obligations of FedNat, enforceable against FedNat in accordance with its terms.

6.18   NO ORAL MODIFICATION.   THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

6.19   This Agreement is intended to amend, restate and replace in its entirety a certain Intercreditor Agreement by and among Fundamental Funding, LLC, Enterprise, the Borrower,

16

#996843

Rajeev Sharma and Vishnu Sharma dated January 12, 2017, as amended, restated, replaced and/or otherwise modified from time to time. This Agreement is not a novation.

**[SIGNATURE PAGE TO FOLLOW]**

#996843

[SIGNATURE PAGE TO INTERCREDITOR AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

ENTERPRISE:

ENTERPRISE BANK

By: _____
Name:  DAVID D. MILLER
Title:  Senior Vice President

FEDNAT:

FEDERAL NATIONAL PAYABLES, INC.
d/b/a Federal National Commercial Credit, Inc.

By: _____
Name:  KYSHA A. PIERRE-LOUIS
Title:  Chief Credit Officer

BORROWER:

VIDEOMINING CORPORATION

By: _____
Name:  RAJEEV SHARMA
Title:   President

18

#996843

SCHEDULE I

FedNat Priority Collateral

All right, title and interest of Borrower in all of the following assets:

All accounts of the Borrower, contract rights of the Borrower, deposit accounts of the Borrower (other than deposit accounts with Enterprise Bank), work in process of the Borrower (including trademarks and copyrights) which are specifically being developed for a customer of the Borrower and the ownership of which is to be transferred to such customer, and inventory of the Borrower, as all such terms are defined by generally accepted accounting principles in the United States of America in effect from time to time.

19